TVT RECORDS and TVT Music, Inc., Plaintiffs,

v.

The ISLAND DEF JAM MUSIC GROUP and Lyor Cohen, Defendants.

The Island Def Jam Music Group, a Division of UMG Recordings, Inc., Counterclaimant,

v.

TVT Records, Inc. and Steve Gottlieb, Counterclaim–Defendants.

No. 02 CIV. 6644(VM).

United States District Court, S.D. New York.

Sept. 2, 2003.

James E. d'Auguste, James Philip Chou, Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York, NY, Peter L. Haviland, Rhonda R. Trotter, Akin Gump Strauss Hauer & Feld, LLP, Los Angeles, CA, Tuneen E. Chisolm, Akin, Gump, Strauss,

Hauer & Feld, L.L.P., New York, NY, for TVT Records, TVT Music, Inc.

Michael T. Mervis, Proskauer Rose LLP, Mary Mulligan, Esq., Universal Music Group, New York, NY, for the Island DEF Jam Music Group.

Robert J. Eddington, Proskauer Rose LLP, Michael T. Mervis, Alexander Kaplan, Proskauer Rose LLP, Mary Mulligan, Esq., Universal Music Group, Matthew S. Dontzin, James M La Rossa, New York, NY, for Lyor Cohen.

### DECISION AND ORDER

MARRERO, District Judge.

### TABLE OF CONTENTS

| | Page |
|---|---|
| I. BACKGROUND | 416 |
| II. THE VERDICT | 416 |
| III. DEFENDANTS' CHALLENGE | 417 |
| A. THE LARGER DEBATE | 417 |
| 1. History | 418 |
| 2. Functions and Distinctions of Remedial Damages | 422 |
| 3. Enduring Concerns Over Punitive Damages | 426 |
| a. Lower Protective Standards | 426 |
| b. Minimal Jury Guidance | 427 |
| c. Improper Considerations | 428 |
| d. Windfalls | 428 |
| e. Encouraging or Prolonging Unnecessary Litigation | 429 |
| f. Overdeterrence | 429 |
| g. Defendant's Wealth | 430 |
| h. Indemnification | 430 |
| i. Limitations of Judicial Review | 430 |
| j. Punitive Damages "Crisis" | 431 |
| B. PUNITIVE DAMAGES JURISPRUDENCE | 432 |
| 1. Reprehensibility | 437 |
| a. Misconduct | 437 |
| b. Injuries | 438 |
| c. Nature of the Parties and Their Relationship | 438 |
| 2. Proportionality | 440 |
| 3. Aggravating or Mitigating Circumstances | 440 |
| a. Similar or Related Misconduct | 440 |
| b. Penalties in Comparable Cases | 440 |
| C. APPLICATION OF PUNITIVE DAMAGES DOCTRINE TO THE INSTANT CASE | 441 |
| 1. The Jury Instructions | 441 |
| 2. Application of Functions and Variables | 442 |
| a. Reprehensibility | 442 |
| (i) Misconduct | 442 |
| (ii) Injuries | 443 |
| (iii) Relationships | 444 |
| b. Proportionality | 449 |
| c. Aggravating or Mitigating Circumstances | 452 |
| (i) Other Related Conduct | 452 |
| (ii) Litigation Costs | 453 |
| (iii) Penalties in Comparable Cases | 454 |
| d. Conclusion | 455 |

IV. *REMITTITUR* ............................................................. 456
    A. *COHEN'S NET WORTH AND ABILITY TO PAY* ...................... 456
    B. *REMITTITUR AS TO COHEN* ..................................... 461
    C. *REMITTITUR AS TO IDJ* ....................................... 461

V. *ORDER* ................................................................... 461

## I. BACKGROUND

In a bifurcated trial of this action, the jury returned a verdict in favor of plaintiffs TVT Records and TVT Music, Inc. (collectively "TVT") finding liability against defendant The Island Def Jam Music Group ("IDJ") for breach of contract and against IDJ and its Chairman, Lyor Cohen ("Cohen," and collectively with IDJ, the "Defendants") for tortious interference with contractual relations, fraud by fraudulent concealment, and willful copyright infringement. The same jury, at the damages phase, assessed compensatory and punitive damages against Defendants in the aggregate amount of approximately $132 million.

Defendants filed post-trial motions for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), and for a new trial and/or remittitur pursuant to Fed.R.Civ.P. 59. By Decision and Order titled *TVT Records v. The Island DEF Jam Music Group*, 279 F.Supp.2d 366, 2003 WL 22056304, No. 02 Civ. 6644(VM), slip op. (S.D.N.Y. September 2, 2003) (the "Post–Trial Motions Decision"), issued simultaneously with and accompanying the instant ruling, the Court denied the motions for judgment as a matter of law and for a new trial.[1] Defendants' motions for remittitur are addressed separately in this decision. For the reasons discussed below, Defendants' motions for remittitur are GRANTED.

## II. THE VERDICT

The facts and events that gave rise to this litigation and upon which the jury's determination of liability and damages is predicated are summarized in the accompanying Post–Trial Motions Decision, *supra*, addressing the parties' other post-trial requests for relief, as well as in numerous prior rulings of this Court resolving other aspects of the case.[2] Portions of this background are recited below as necessary for the purposes of the motions at hand.

The compensatory and punitive damages awards the jury returned in respect of TVT's various claims are summarized in the following chart:

1. The Post–Trial Motions Decision also addressed TVT's motions for prejudgment interest and injunctive relief.

2. *See, e.g., TVT Records v. Island Def Jam Group*, 244 F.Supp.2d 263, 266–68 (S.D.N.Y. 2003); *TVT Records v. The Island Def Jam Music Group*, 225 F.Supp.2d 398, 399–406 (S.D.N.Y.2002); *see also TVT Records v. The Island Def Jam Music Group*, 262 F.Supp.2d 188, 189–191 (S.D.N.Y.2003); *TVT Records v. The Island Def Jam Music Group*, No. 02 Civ.

6644(VM), 2003 WL 1858151 (S.D.N.Y. Apr. 9, 2003).

3. TVT elected to receive, with respect to the jury's finding of willful copyright infringement relating to one of TVT's claims, the statutory damages award determined by the jury, as an alternative to actual damages, profits, and punitive damages assessed as to that claim. Accordingly, this aspect of the jury's verdict is not further addressed here.

| CLAIMS | COMPENSATORY | | PUNITIVE | |
|---|---|---|---|---|
| | IDJ | Cohen | IDJ | Cohen |
| 1. Breach of Contract:<br><br>  General Damages: $50,994<br><br>  Special Damages:<br><br>    Lost Profits: 30,290<br><br>    Goodwill: 45,436 | $ 126,720 | $ N/A | $ 1,000,000 | $ N/A |
| 2. Tortious Interference with Contractual Relations:<br><br>  General Damages: $0<br><br>  Special Damages:<br><br>    Lost Profits: 10,358,713<br><br>    Goodwill: 12,000,000 | 22,358,713 | 22,358,713 | 50,000,000 | 50,000,000 |
| 3. Fraudulent Concealment: | 1,011,313 | 1,011,313 | 1,000,000 | 6,000,000 |
| 4. Copyright Infringement:[3]<br><br>  "The Rain" | 409,375 | 409,375 | N/A | N/A |
|   "Get Tha Fortune" | 1,900 | 1,900 | 275,000 | 25,000 |

## III. DEFENDANTS' CHALLENGE

### A. THE LARGER DEBATE

IDJ and Cohen object to both the propriety of the jury's verdict awarding punitive damages with regard to the claims at issue, and to the amounts assessed. Defendants contend that the awards are unjustified and unconstitutionally excessive. This challenge touches upon the subject of a major debate still unresolved in American jurisprudence and implicates fundamental questions: in broad terms the propriety, functions and limits of punitive damages in civil litigation. More narrowly addressing this case, the motions ask the Court to decide whether the jury's imposition of penalties was appropriate, and whether the magnitude of the awards was reasonable under the circumstances presented, or excessive enough to offend constitutional principles of fairness embodied in our justice system.[4]

The larger controversy is both fundamental and enduring, encompassing a broad array of issues that, alone or in combination, give rise to substantial constitutional concerns. *See, e.g., Honda Motor Co. v. Oberg,* 512 U.S. 415, 432, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994) ("Punitive damages pose an acute danger of arbitrary deprivation of property."); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 8, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (accepting jurisdiction "to review the punitive damages procedures and award in the light of the long-enduring debate about their propriety."); *id.* at n. 4, 111 S.Ct. 1032 (citing past and present polemics addressing different perspectives argued in the debate); *see also id.* at 42, 111 S.Ct. 1032 (O'Connor, J., dissenting) ("Punitive damages are

---

4. The applicability of punitive remedies to redress TVT's various claims, and the sufficiency of the evidence to support punitive damages on the law and the facts of this case, are more specifically addressed in the companion Post–Trial Motions Decision, *supra,* as well as in other prior rulings of this Court relating to this action. *See* decisions listed *supra,* note 2.

a powerful weapon. Imposed wisely and with restraint, they have the potential to advance legitimate state interests. Imposed indiscriminately, however, they have a devastating potential for harm. Regrettably, common-law procedures for awarding punitive damages fall into the latter category."); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("In most jurisdictions jury discretion over the amounts awarded is limited only by the gentle rule that they not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused."). The questions yet unsettled in this dispute continue to vex litigants, courts, legislators and members of the general public, and thus present formidable challenges to our legal system.[5]

The parties' conflict over the punitive damages the jury awarded here forms part of that overarching controversy, a piece of a whole the precise contours of which remain in doubt. The modern content and pathways of the law—what a legal doctrine now stands for and where it seems headed—are always best understood as branchings of an organic growth, a continuum grounded in the rule's earliest roots and ramifications. As backdrop for the Court's review of the issues before it, and as a guide to the considerations that weighed heavily in the Court's deliberation, an overview of the history, evolution and contemporary scope of punitive damages doctrine may provide helpful context.

### 1. History

The modern doctrine of punitive or exemplary damages has been traced to codes adopted by various ancient civilizations,[6] and later emergence of the remedy in applications reflected in early English statutes and common law.[7] *See Oberg,* 512 U.S. at 421–24, 114 S.Ct. 2331 (citing early English cases); *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 580–81, 116

---

**5.** *See generally* Cass R. Sunstein, Daniel Kahneman and David Schkade, *Assessing Punitive Damages (with Notes on Cognition and Valuation in Law),* 107 Yale L.J.2071 (1998); A. Mitchell Polinski and Steven Shavell, *Punitive Damages: An Economic Analysis,* 111 Harv. L.Rev. 869 (1998); David G. Owen, *A Punitive Damages Overview: Functions, Problems and Reforms,* 39 Vill. L.Rev. 363 (1994); Michael Rustad and Thomas Koenig, *The Historical Continuity of Punitive Damages Awards: Reforming the Tort Reformers,* 42 Am. U.L.Rev. 1269 (1993); David G. Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich. L.Rev. 1257 (1976).

**6.** *See generally* Rustad and Koenig, *supra,* at 1285–97; Owen, *A Punitive Damages Overview: Functions, Problems and Reforms, supra,* at 368.

**7.** In *Huckle v. Money,* 95 Eng. Rep. 768 (K.B. 1763), oft-cited as the earliest reported case articulating the concept of "exemplary damages" as a distinct legal doctrine, plaintiff sued agents of the government for false imprisonment, trespass and assault arising out of a purportedly unlawful warrant issued for the arrest and prosecution of the publishers and writers of a newspaper article critical of the King. The jury awarded plaintiff damages of 300 pounds, an amount considerably larger than the actual harm plaintiff had suffered. The court, stating that the jury had "done right in giving exemplary damages" noted that "the small injury done to the plaintiff, or the inconsiderableness of his station and rank in life did not appear to the jury in that striking light in which the great point of law touching the liberty of the subject appeared to them at trial ...." *Id.* at 769. In a companion case, *Wilkes v. Wood,* 98 Eng. Rep. 489 (K.B.1763), plaintiff, the editor of the offending newspaper, asked for a large award of exemplary damages to punish and deter such outrageous misconduct, arguing that a verdict limited only to actual damages would be inadequate to serve those purposes. *Id.* at 500–01. The jury awarded him 1000 pounds. *Id.* at 490.

S.Ct. 1589, 134 L.Ed.2d 809;[8] *Roginsky v. Richardson–Merrell, Inc.,* 378 F.2d 832, 838 (2d Cir.1967).

In typical early applications, the remedy was imposed in instances involving severe intentional misconduct causing bodily injury, personal affronts or deprivations of property. Especially noteworthy in the formative precedents were cases evincing a defendant's abuse of social status, wealth or public office, for instance through deliberate injuries inflicted by a master assaulting or killing a servant,[9] by a person of great wealth or rank outrageously mistreating a poor one, and by agents of the state misusing authority.[10] *See Roginsky,* 378 F.2d at 838 (noting the early use of punitive damages for the purposes of "redressing affronts to personal feelings not susceptible of measurement . . . financing the cost of deserving litigation where only small compensatory damages can be expected, diverting the plaintiff's desire for revenge into peaceful channels, and serving as punishment for and deterrence from socially disapproved conduct.")

These antecedents are instructive in that they reflect essential aspects of punitive damages doctrine that have endured and carried forward to this day. The common elements that emerged reflect: extreme misconduct ordinarily characterized by purposeful acts deemed intentionally malicious, wilful, wanton, or oppressive; the gravity of the wrongdoing measured in accordance with the reprehensibility of the offender's state of mind—his affirmative motive or indifference in bringing about particular damage—in relation to the extent of the attendant injuries. By reason of the uniqueness and culpability of the offending acts, the harms caused by such virulent behavior were not deemed adequately compensable by other recognized civil means.

Other defining features of contemporary punitive damages rules may also be discerned from the early precedents. Material transgressions were deemed committed not only against the interests of the victim, but also against general public values, or both. The overall effects of resulting injuries were intensified because the offender's behavior was considered not only egregious and unjustifiable but had no acceptable social utility or redeeming public value. And the monetary award conferred upon the complainant was valued in some fixed multiple or augmented to discretionary amounts generally related to appraised harm, the enhanced penalty reflecting the social order's assessment of moral outrage and its manifestation of the normal retributive impulse evoked by extreme moral transgressions. The larger damages also served to publish an expression of the severity ascribed to particular offenses as publicly warranting a commensurately harsh punitive response.

**8.** The Supreme Court cited studies identifying some 65 different English statutes enacted between 1275 and 1753 authorizing the awarding of double, treble and quadruple damages for particular wrongs. *See id.*

**9.** *See* Rustad and Koenig, *supra,* at 1286 (noting that the early Romans employed multiple damages "to constrain wealthy elites" and "to mediate social relations between patricians and plebeians and to punish those who injured or killed slaves").

**10.** *See id.* at 1289–90 (citing early English cases in which courts employed the punitive damages remedy to punish and deter "the misuse of wealth and power that threatened the eighteenth century English social order") (internal citations omitted); *id.* at 1289 n. 101 (noting other authority for the use of the remedy "to assuage injured feelings and the sense of outrage created by the arrogance of powerful economic and political elites.") (citing Charles T. McCormick, *Handbook on the Law of Damages,* 286–92 (1935)).

Another salient point, perhaps the most fundamental, emerges from all of the circumstances in which over time punitive damages have been regarded as fitting and proper: an element of substantial disproportionality common to and characterizing the various conditions and relationships that marked the situations justifying the remedy.[11] Most prominent in the expression of this feature are: relatively large differences in social rank or economic power or vulnerability often separating the offender and the victim; aggravated misconduct vastly and improperly out of scale with whatever response the circumstances reasonably may have called for; the extent of actual or potential injuries to the victim or the public far exceeding the costs or burdens the wrongdoer would incur in avoiding the large degree of foreseeable risks; significant consequential harm to recognized public values even where the victim's actual loss may be economically small or intangible but weighs substantially more in relation to the damages assayed in unquantifiable terms, for example, effects on the victim's human dignity, social equality or moral worth or on general public health, safety or order; considerable social or economic gains derived from severe malfeasance that accrue only to the offender and that, unrectified, would materially enrich the wrongdoer at the expense of the victim's rights and the public's interests, and would effectively enable or condone an inequitable distribution of social benefits and duties. These various large asymmetries engendered by unconscionable misdeeds were deemed to produce correspondingly severe interpersonal imbalances and skewings of human relations that threatened to disrupt public safety or social order,[12] thus justifying heavier penalties for the particular civil offenses.

Historically, the prototypical punitive damages case continued to follow the pattern of the early applications: intentional wrongs committed usually by a known offender and involving injuries to a single victim. *See Roginsky* 378 F.2d at 838–39. Later developments in the progression of the doctrine significantly altered the remedial landscape in which exemplary damages were imposed, and laid the groundwork for the contemporary debate framing the issues now before this Court. One outgrowth of this evolution was the extension of the remedy to harms not specifically designed or intended by the wrongdoer but which occurred by reason of his conscious and deliberate disregard for the rights of others, a dimension of conduct also deemed willful or wanton when it caused grave actual or potential harm. *See id.* at 838 (citing W. Prosser, *Prosser on Torts* § 2, at 10 (1964)).

Another significant change emerged from the monumental expansion of the corporate form that developed to govern business management and production. When injuries arose from the business practices or relations of corporations with customers, employees and the public in general, as well as from their competitive behavior

---

**11.** While conceptually the punitive sanction is a byproduct of this disproportionality, in practice, as elaborated below, its imposition is circumscribed by a counterveiling principle of proportionality. The doctrine of proportionality as it relates to exemplary damages was adopted and articulated in early Supreme Court jurisprudence. *See Gore,* 517 U.S. at 575, 116 S.Ct. 1589 (quoting *Day v. Woodworth,* 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1851) (asserting that punitive damage awards should reflect a relationship to "the enormity of [the defendant's] offense") and *St. Louis, I.M. & S.R. Co. v. Williams,* 251 U.S. 63, 66–67, 40 S.Ct. 71, 64 L.Ed. 139 (1919) (instructing that punitive damages may not be "wholly disproportioned to the offense")).

**12.** *See, e.g.,* Rustad and Koenig, *supra* at 1289–90.

with other enterprises, the punitive damages remedy was then extended as a means to redress the ensuing wrongs and ensure corporate compliance with acceptable moral norms and commercial policies. As corporate business spread, so did the incidence of wrongful outrages and excesses that inflicted harms through intentional acts or gross carelessness of the corporation and its agents. *See generally* Rustad and Koenig, *supra* at 1294–97 and accompanying notes. Concomitantly, the application of punitive damages also grew as a remedial device to offset the now much greater disproportions in pertinent relationships that were brought about by extreme corporate misconduct and its various social, economic and legal effects. For a variety of related reasons, this development produced the perception or reality of the phenomenon that underlies the current debate: a significant proliferation in the incidence and size of punitive damages awards.

In the expanded corporate form, certain industries located and transacted business in multiple jurisdictions. As a consequence, several new dimensions and complexities were introduced into the punitive damages controversy spawned by the rise of litigation, significantly altering the realities and economics of the remedy. One essential aspect of the contemporary debate is the shift in motives and driving force associated with the underlying wrongful deeds. In the modern trend, the extreme misconduct giving rise to claims for punitive damages more commonly entails not the intentional malicious act of an individual offender, but, rather, acts committed by corporate agents typically involving defective operations or gross carelessness in the production of goods or services. These deficiencies in turn create health and safety hazards that cause actual or potential injury to large numbers of consumers, employees and/or the general public. Thus, while in the early prototypes the gratuitous moral wrong inflicted by one individual upon another generally had no connection to any activity of public value, the punished misconduct that characterizes the contemporary debate more frequently is profit-driven and entails calculated business risks at least colorably associated with production of goods or services having some social utility.

Several vital features mark the shift and shape modern punitive damages controversies: rather than the open and deliberate or wanton act of a known individual offender, the corporate misconduct, by reason of the greater complexity of production processes, the larger number of corporate agents and entities involved in the enterprise and the distant or dispersed operations of the business, is often hidden and far more difficult to detect. As a consequence, in this model the likelihood that the offender may escape full liability and thus derive immense profits from wrongdoing raises greater fundamental concerns.

Moreover, by reason of the vastly expanded field of business operations, the injuries associated with extreme corporate misconduct more often affect not just one but multiple victims. Hence, the extent of the individual and public harms, both to the immediate victim and to those who as consumers or shareholders have an interest in the corporation's activities, may be substantially larger. In addition, frequently the corporate wrongdoers tend to be nonresident entities whose origins may be difficult to trace and which are generally viewed by juries abstractly and less sympathetically than known, local defendants.[13] Because of the enormous com-

---

13. *See, e.g., TXO Prod. Corp. v. Alliance Res.*    *Corp.*, 509 U.S. 443, 490, 113 S.Ct. 2711, 125

pass of business operations, the stated wealth, economic and political power and other resources potentially at the disposal of some corporate wrongdoers are reported in staggering magnitudes that vastly intensify perceptions of corporate misdeeds and resultant injuries and dwarf the means available to most individual victims to prosecute them.

Overall, these circumstances combine to produce a magnifying effect enlarging the calculus and economics associated with punitive damages. In this bigger picture, the disproportions defining the underlying relationships among parties and events are exponentially distorted. The skewing effects then manifest in the size of some punitive damages awards prominently reported. As a result, the stakes in the controversies grow bigger in a self-fulfilling spiral. The more extensive and complex the field of the wrongdoer's operations, the more far-reaching the impacts of egregious civil wrongs are likely to be when calculated in terms of the number of victims actually or potentially harmed, the enormity of the injuries inflicted and the scope of other interests adversely touched. From this causal template follow other patterns and consequences that come to bear on assessments of punitive awards: the greater the divide between actual or potential injuries and the cost of their prevention; the larger the wealth and power of the wrongdoers and the punitive damages required to affect their conduct in material ways; the mightier the resources necessary to induce and sustain the prosecution of egregious wrongdoings and those

available to the victims; the higher the number of known injuries victims assert in lawsuits and those that go undetected and unprosecuted; the farther removed the wrongdoer is situated from the victim and the place where the offense is adjudicated—in sum, the more considerable the correspondences and disparities inherent in these relationships, the higher the resulting punitive awards the combined factors are likely to yield.

### 2. *Functions and Distinctions of Remedial Damages*

■ In simplest terms, civil damages theory holds that compensatory and punitive damages are conceptually different and serve distinct purposes. *See State Farm Mutual Auto. Ins. Co. v. Campbell,* —— U.S. ——, ——, 123 S.Ct. 1513, 1519, 155 L.Ed.2d 585 (2003) ("[I]n our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decision maker, serve different purposes.") (citing *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)). Compensatory awards function to redress the harms caused by the defendant's wrongful conduct and thereby strive to make the victim whole, insofar as recompense for an injury may be achieved practically and fairly through monetary satisfaction. *See id.* (citing Restatement (Second) of Torts § 903, at 453–54 (1979)).

The reparatory design of punitive dam-

L.Ed.2d 366 (1993) (O'Connor, J., dissenting) ("Courts long have recognized that jurors may view large corporations with great disfavor.... Corporations are mere abstractions and, as such, are unlikely to be viewed with much sympathy. Moreover, they often represent a large accumulation of productive resources; jurors naturally think little of taking an otherwise large sum of money out of what appears to be an enormously larger pool of wealth. Finally, juries may feel privileged to correct perceived social ill stemming from unequal wealth distribution by transferring money from 'wealthy' corporations to comparatively needier plaintiffs.") (internal citations omitted).

ages encompasses broader purposes.[14] The remedy aims to punish egregious malfeasance and deter the offender and potentially other persons from engaging in similar wrongful conduct. *See id.* (citing *Cooper Indus.*, 532 U.S. at 432, 121 S.Ct. 1678); *Gore*, 517 U.S. at 568, 116 S.Ct. 1589 ("Punitive damages may properly be imposed to further a State's legitimate interest in punishing unlawful conduct and deterring its repetition."); *Haslip*, 499 U.S. at 19, 111 S.Ct. 1032; *see also United States v. Halper*, 490 U.S. 435, 448, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) (noting that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can be explained only as also serving either retributive or deterrent purposes, is punishment. . . .").

As punishment, punitive damages work to impose on wrongdoers who inflict particularly acute, intentional or wanton harm a kind of "quasi-criminal" penalty in the form of "private fines". *Cooper Indus.*, 532 U.S. at 432, 121 S.Ct. 1678 (quoting *Haslip*, 499 U.S. at 54, 111 S.Ct. 1032 (O'Connor, J., dissenting)); *International Broth. of Electrical Workers v. Foust*, 442 U.S. 42, 48, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979) (characterizing punitive damages as "private fines levied by civil juries."). The remedy benefits the victim and the general public by providing a measured and socially recognized outlet for retribution that goes beyond the mere restoration of the victim's actual loss and that achieves greater deterrence than restitutional awards limited to compensation for the particular injuries the wrongdoer inflicted.

By these means, the social system may attain certain structural ends. It endeavors to preserve an equitable balance of rights and duties among members. It discourages excessive self-help and private vengeance by legitimizing a method by which personal and public indignation and anger toward an offender may be vented and channeled in considered, proportionate ways. And it offers incentives for mediation of social relations and resolution of disputes by acceptable peaceful methods. Overall, a proper remedy fosters trust in the fairness of the legal system and confidence in the binding rules by which all members are obliged to abide.

The deterrent purposes of punitive damages manifest in various ways. First, this aspect of the remedy serves an educational role. It publishes the social code defining parts of the community's mores, specifically, the kinds of conduct deemed particularly blameworthy. It gives notice of the types of transgressions that evoke moral outrage and of the fitting gradations of recognized responses, thus alerting all members of a society of the proper balance of their rights-duties relationships—the values and expectations the social system prescribes—and informing the calculus and economics of private wrongdoing in derogation of recognized standards. To these ends, the punitive remedy: not only puts potential wrongdoers on notice of the types of private wrongs that the law defines as particularly reprehensible and harmful but underscores the gravity of the offenses through the sting of harsher remedies; signals that such enhanced penalties are imposed to remove the transgressor's incentive and profitability from engaging in aggravated miscon-

---

**14.** As one court put it, the law relating to exemplary damages "[t]ends to elevate the jury as a responsible instrument of government, discourages private reprisals, restrains the strong, influential and unscrupulous, vindicates the right of the weak, and encourages recourse to, and confidence in, the courts of law by those wronged or oppressed by acts or practices not cognizable in, or not sufficiently punished, by the criminal court." *Luther v. Shaw*, 157 Wis. 234, 147 N.W. 18, 20 (1914).

duct and to enlarge the hazards potential lawbreakers should reckon and assume in calculating the odds that the offenses would go undetected or that the victim would not prosecute the wrong; and highlights that the prospect of significantly larger recovery is likely to induce more injured parties to vindicate their rights, and indirectly the rights of others, thereby off-setting any underenforcement by other victims, diminishing the chances that flagrant offenses will go unenforced and unpunished and, conversely, materially raising the odds that violators would be compelled to restore illicit gains.

Upon deeper inquiry, however, the common formulations and distinctions drawn between the purposes served by punitive and compensatory damages occasionally fall short as decisional guides. Thus the Court's task in ruling on issues pertaining to damages requires further analysis and calibration. For, despite the stock bromides generally pronouncing that the aim of compensatory damages is solely to restore the plaintiff's loss and not to punish the defendant, in fact this restitutional remedy does possess a deterrent and punitive aspect as well. This objective manifests especially in cases in which the wrongdoer is known and the injury is monetarily recompensed to the full extent of the proven damages, or where the compensatory component of a verdict takes account of damages for severe injuries that cause the victim acute distress, and arouse public anger and indignation—effects not readily quantifiable. *See State Farm,* —— U.S. at ——, 123 S.Ct. at 1525 (noting that an award of compensatory damages already contains a punitive element reflecting the distress caused by outrage and humiliation suffered by the victim and that punitive damages also operate to condemn such conduct) (citing Restatement (Second) of Torts § 908, cmt. c, at 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both.")); *see also Roginsky,* 378 F.2d at 841 ("Many awards of compensatory damages doubtless contain something of a punitive element, and more would do so if a separate award for exemplary damages were eliminated.").

In these situations, a full compensatory award not only places upon the defendant the obligation to make the victim whole; it also superimposes substantial additional costs: the expenses and other burdens associated with defending the litigation; the risks of uncertainty attendant to the computation of assessed damages; the deleterious effects of bad publicity; and in some cases the prospect of paying the prevailing party's attorneys fees.

By the same token, not only do compensatory damages awards at times achieve punitive ends, the converse is also true. Though courts generally identify punishment and deterrence as the predominant goals of exemplary damages, as a practical matter the punitive award not only serves the additional purposes described above, but, under some circumstances, a number of the remedy's other functions may overlap with the restitutional role of compensatory damages, and may indeed duplicate compensatory recovery.[15] For instance,

---

**15.** In fact, until later evolution of theories of compensatory damages, punitive damages operated to permit recompense for intangible and not readily quantifiable injuries, such as pain and suffering and emotional distress, that were not recognized under the narrower prevailing concept of compensatory recovery. *See Cooper Indus.,* 532 U.S. at 437 n. 10, 121 S.Ct. 1678 (citing *Haslip,* 499 U.S. at 61, 111 S.Ct. 1032 (O'Connor, J., dissenting)).

insofar as, for a variety of reasons, not all victims of a particular instance of extreme misconduct pursue their legal remedies, the offender may profit from underenforcement, potentially engendering diminished deterrence and encouraging additional or sustained misbehavior by the same or other wrongdoers. At least theoretically, in incidents of wrongful acts that injure many victims, a large enough punitive recovery by one plaintiff may reflect derivative "compensation" for the harms inflicted upon other victims similarly injured but unwilling or unable to enforce their claims. In essence, the defendant is compelled to disgorge to one litigant portions of the wrongdoer's unlawful gains attributable to harms that otherwise may go undetected or unprosecuted.

Moreover, though in theory the aim of compensatory damages is to make the injured party "whole," in reality not every actual injury the victim of private misconduct suffers is entirely compensable. Under applicable compensatory damages rules, some losses may not be recoverable at all; some may not be provable; some may have lapsed; some, however felt, may be intangible and not capable of reasonable measure or practical quantification; and some, such as the full financial burdens and emotional toll associated with pursuing litigation, are assumed to be absorbed in the first instance by the victim. Under these circumstances, the recovery of punitive damages in excess of pure monetary compensation for actual injuries suffered, to some extent serves additionally to fill the "gaps," to "recompense" the victim of egregious misconduct for the components of intangible, unquantifiable and exceptional losses that may be missed in the computation of recoverable compensatory damages. *See State Farm,* —— U.S. at ——, 123 S.Ct. at 1525; *see generally* Owen, *Punitive Damages in Products Liability Litigation, supra,* at 1295–98.

But, as is often the case, to articulate a rule in theory is far easier than to confirm that in practice it works as modeled. Because the computation of damages is not a precise science and juries are not required to produce punctilious accountings of their awards, there is no satisfactory way to establish that aspects of losses theoretically not recoverable as compensatory damages are nonetheless injected into the calculation of a full compensatory award and embodied as well in accompanying punitive damages.

Finally, the punitive remedy also serves a compensatory law enforcement function. It recognizes and rewards the unique risks the victims bear and the form of public service they render in enforcing the law against major offenders who otherwise might go unpunished and undeterred. This purpose results particularly in cases where recovery of compensatory damages may be too small or too costly to pursue in relation to the actual loss, or where the criminal law may not apply or public law enforcement resources may not stretch to prosecute particular wrongs. *See Jackson v. Johns–Manville Sales Corp.,* 781 F.2d 394, 403 (5th Cir.1986) ("[P]unitive damages reward individuals who serve as 'private attorneys general' in bringing wrongdoers to account.")[16] In practice, this bounty function is recognized and given

---

16. *See also* Rustad and Koenig, *supra,* at 1322–23 ("The possibility of being awarded punitive damages encourages plaintiffs to act as 'private attorneys general' and provides incentives for plaintiffs to sue in instances where conduct has caused widespread harm. Punitive damages permit the litigation of claims that might otherwise be too expensive for an individual plaintiff to prosecute, and they serve as 'bounty' for the plaintiff.") (citations omitted); Owen, *Punitive Damages in Products Liability Litigation, supra,* at 1287–95.

expression, as in the case at hand, by rules permitting juries to hear evidence of, and to take into account in assessing punitive damages, the extent of attorneys fees and other litigation costs plaintiffs are forced to incur in order to prosecute aggravated wrongdoings.[17] *See, e.g., Haslip*, 499 U.S. at 22, 111 S.Ct. 1032; *Softel, Inc. v. Dragon Med. and Scientific Comm. Ltd.*, 891 F.Supp. 935, 945–46 (S.D.N.Y.1995) (citing New York Law).

### 3. Enduring Concerns Over Punitive Damages

The Supreme Court has recognized that, despite whatever virtues may justify the imposition of exemplary damages, and however long and respectably rooted its lineage may be, the remedy is far from perfect. *See State Farm*, —— U.S. at ——, 123 S.Ct. at 1520; *Haslip*, 499 U.S. at 18, 111 S.Ct. 1032; *TXO*, 509 U.S. at 473–75, 113 S.Ct. 2711 (O'Connor, J., dissenting). The evolution of the doctrine has not corrected various deficiencies associated with civil penalties. Substantial rough spots and potential abuses unresolved by statutory or common law still attend the remedy. These concerns continue to engender recurring objections.[18] Critiques of what is wrong about the remedy help in streamlining the contours of what is right and properly applying what remains.

### a. Lower Protective Standards

Though acknowledged to embody a punishment purpose somewhat comparable to that served by criminal law, exemplary damages are subject to none of the heightened constitutional safeguards that attach to criminal procedures to assure that prosecution of crimes extends only to the match of proper offenses and proper offenders and that any penalties ultimately meted out not only reflect considered and proportionate relationship to the wrongs actually committed but also satisfy other basic indices of fairness. *See State Farm*, —— U.S. at ——, 123 S.Ct. at 1520 ("Although these awards serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding."). Protections that accompany criminal sanctions and not attendant to quasi-criminal "fines" include: the more rigorous standard of proof beyond a reasonable doubt; the size and role of the jury in determining guilt but not punishment; the unanimous verdict; proscriptions against self-incrimination, double jeopardy, cruel or unusual punishment and excessive fines; and the right to counsel.

Moreover, offending criminal conduct in its varying degrees and corresponding penalties are statutorily defined, codified and published so as to reflect at any given time and place the recognized severity of unlawful conduct and the values that society, through publicly designated represen-

---

**17.** The incentive role may be somewhat problematic in some cases, however. Where the litigation involves multiple claims arising out of the same core events, some based on common law and some on statutory actions that authorize recovery of attorney's fees and costs, a common law punitive award that may reflect litigation costs as an unspecified component of harms suffered and burdens incurred may be duplicated where plaintiff later separately seeks recovery of fees and costs authorized by statute.

**18.** *See e.g.*, Rustad and Koenig, *supra*, at 1275–82 (noting that "[m]ultimillion dollar punitive damages awards have caused an outcry that this remedy is out of control" and summarizing the debate as expressed by courts, legislatures, commentators and business leaders); Owen, *A Punitive Damages Overview: Functions, Problems and Reforms*, *supra*, at 371–73.

tatives, ascribes to particular forms of deviant behavior. To punish and deter criminal deeds, legally prescribed penalties—both maximum and minimum—are matters of public record. And the rules controlling the admissibility of evidence, the conduct of the trial and the judge's instructions to the jury are more exacting and precise in circumscribing both what is admissible material for the trier of fact to consider in reaching a verdict and subsequently the range of permissible penalties the court may impose. Those standards are nationally uniform, applying equally in every state under the constitutional oversight and guidance provided by the Supreme Court.

By contrast, the imposition of punitive damages is not governed by such rigorously defined, published or uniform rules, raising concerns voiced by the Supreme Court "over the imprecise manner in which punitive damages systems are administered" and that "'[p]unitive damages pose an acute danger of arbitrary deprivation of property.'" *Id.,* —— U.S. at ——, 123 S.Ct. at 1520 (quoting *Oberg,* 512 U.S. at 432, 114 S.Ct. 2331 (1994)). Neither fixed floors nor caps to recovery of punitive damages exist in many jurisdictions, sometimes rendering awards too small to serve their intended punishment and deterrent ends, and sometimes much larger than may be appropriate for their purpose, thus offending basic notions of fairness and justice. *See id.*

#### b. *Minimal Jury Guidance*

A particular concern about punitive damages repeatedly voiced by the Supreme Court is that civil liability for outrageous wrongdoing warranting punishment beyond compensatory damages may be determined in accordance with sometimes vague standards of conduct defined in terms such as "wanton", "reckless", "conscious or deliberate indifference". *See, e.g., Oberg,* 512 U.S. at 432, 114 S.Ct. 2331; *Haslip,* 499 U.S. at 12, 111 S.Ct. 1032; *Gertz,* 418 U.S. at 350, 94 S.Ct. 2997. Jury instructions may provide no more than skeletal guidance to constrain discretion and protect against unwarranted coercion and arbitrary deprivations of property. As the Supreme Court has noted:

> Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences.

*Oberg,* 512 U.S. at 432, 114 S.Ct. 2331; *see also State Farm,* —— U.S. at ——, 123 S.Ct. at 1520; ("Vague instructions, or those that merely inform the jury to avoid 'passion or prejudice,' ... do little to aid the decision-maker in its task of assigning appropriate weight to evidence that is relevant and evidence that is tangential or only inflammatory."); *TXO,* 509 U.S. at 474–75, 113 S.Ct. 2711 (O'Connor, J., dissenting) (noting that the risk of prejudice, bias and caprice is especially real in the area of punitive damages, "where juries sometimes receive only vague and amorphous guidance. Jurors may be told that punitive damages are imposed to punish and deter, but rarely are they instructed on how to effectuate those goals or whether any limiting principles exist."); *Haslip,* 499 U.S. at 12, 111 S.Ct. 1032 (quoting *Gertz,* 418 U.S. at 350, 94 S.Ct. 2997); *id.* at 49, 111 S.Ct. 1032 (O'Connor, J., dissenting) (noting that "most common-law punitive damages instructions ... ha[ve] 'an open-ended, anything-goes quality that can too easily stoke ... the vindictive or sympathetic passions of juries.'") (quoting P. Huber, *Liability: The Legal Revolution and Its Consequences* 118 (1988)); *Browning–Ferris Indus. of Vt., Inc. v. Kelco Dis-*

*posal, Inc.,* 492 U.S. 257, 281, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (Brennan, J., concurring) ("[P]unitive damages are imposed by juries guided by little more than an admonition to do what they think is best.").

In consequence, under the less stringent common law tests that regulate the finding of civil liability and imposition of punishment for flagrant private wrongs, absent more concrete standards, courts generally accord juries substantial latitude to award punitive damages, limited only by what may be deemed the amount of penalty necessary to achieve the retributive and deterrent purposes of such damages. *See Gore,* 517 U.S. at 568, 116 S.Ct. 1589; *see also Haslip,* 499 U.S. at 16, 111 S.Ct. 1032. With juries guided by such expansive latitude and minimal instructions confining the exercise of their discretion, erratic or unpredictable punitive awards are bound to result. Defendants may be penalized with exemplary damages that may far exceed the amounts prescribed for comparable conduct in other civil cases in the same jurisdiction, or for similar criminal offenses. *See, e.g., State Farm,* —— U.S. at ——, 123 S.Ct. at 1526; *see also Gore,* 517 U.S. at 585, 116 S.Ct. 1589 (noting that the punitive sanction assessed by the jury, as affirmed by the State courts, was "tantamount to a severe criminal penalty").

### c. *Improper Considerations*

However clearly and firmly juries may be guided and admonished by the court under permissible standards, concerns persist that punitive damages animated by sympathy for the victim, passions stirred by the virulence of the offense, biases related to the defendant's residence, personal or corporate status or wealth, or by other improper motives, could infect the verdict and manifest in excessive awards, the amounts of which may duplicate compensatory recovery, or may be grossly dis-

proportionate to actual harm, or larger than necessary to serve the purposes of punitive sanctions. *See State Farm,* —— U.S. at ——, 123 S.Ct. at 1525 (In finding the punitive award at issue grossly excessive, the Supreme Court noted that portions of the substantial compensatory damages awarded "likely were based on a component which was duplicated in the punitive awards."); *Gore,* 517 U.S. at 584–85, 116 S.Ct. 1589 (expressing concern over the use of the punitive deterrent to impose burdens on nonresident corporations for out-of-state conduct); *TXO,* 509 U.S. at 464, 113 S.Ct. 2711 (agreeing that "the emphasis on the wealth of the wrongdoer increased the risk that the award may have been influenced by prejudice against large corporations, a risk that is of special concern when the defendant is a nonresident."). Offenders thus may be exposed to incrementally higher penalties, to exemplary judgments rendered to multiple plaintiffs in different courts and jurisdictions in litigation involving the same actions, and thus to punitive liabilities mounting to sums potentially ruinous to the defendants. *See Roginsky,* 378 F.2d at 839–40.

### d. *Windfalls*

While one side of the excessive verdict coin portrays the undue burdens defendants may bear, the reverse side expresses concern over potential unjust enrichment of plaintiffs by windfalls that exemplary damages may bestow, particularly to litigants who may enjoy the good fortune of being first to file in court, *see, e.g., Roginsky,* 378 F.2d at 839–40, or of potentially recovering from a deep pocket or fully indemnified defendant, *see, e.g., Haslip,* 499 U.S. at 22, 111 S.Ct. 1032; *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 270–71, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *see also Vasbinder v. Scott,* 976

F.2d 118, 121 (2d Cir.1992); *Aldrich v. Thomson McKinnon Secs., Inc.*, 756 F.2d 243, 249 (2d Cir.1985); *see generally Note, An Economic Analysis of the Plaintiff's Windfall from Punitive Damage Litigation*, 105 Harv. L.Rev.1900 (1992).

Insofar as an award of punitive damages may duplicate aspects of compensatory recovery included in the same verdict, and exceed amounts reasonably calculated to achieve the recognized purposes of exemplary damages, the punitive remedy may confer benefits beyond what the victim may be reasonably entitled to recover. *See, e.g., Gore*, 517 U.S. at 593, 116 S.Ct. 1589 (Breyer, J., concurring) ("Larger damages might also 'double count' by including in the punitive damages award some of the compensatory, or punitive, damages that subsequent plaintiffs would also recover."); *Vasbinder*, 976 F.2d at 121 ("[B]ecause neither compensation nor enrichment is valid purpose of punitive damages, an award should not be so large as to constitute 'a windfall to the individual litigant.' ") (quoting *Aldrich*, 756 F.2d at 249). At bottom, excessive awards tend to inject a redistributive purpose into the apportionment of damages, a role uninformed and unguided by recognized rules and thus unbounded by reasonable constraints.

### e. *Encouraging or Prolonging Unnecessary Litigation*

In some instances the prospect of massive punitive verdicts tends to convert boon and bounty into bonanza, to transform the legitimate private law enforcement incentive embodied in such awards into a ticket to the lottery. *See, e.g., Oki America, Inc. v. Microtech Int'l, Inc.*, 872 F.2d 312, 315–316 (9th Cir.1989) (Kozinski, J., concurring); Note, *supra*, 105 Harv. L.Rev. at 1907–10. Visions of vast punitive winnings may seduce reality, and warp what the facts actually say about the true

worth a claim. Such delusionary litigation encourages plaintiffs' races to the courthouse to be first filers and may breed exuberance and obstinacy in pursuit of claims that otherwise might settle. *See Oki America*, 872 F.2d at 315 (Kozinski, J., concurring) (noting that "the allure of punitive damages ... entices into court parties who might otherwise be inclined to resolve their differences."). This effect follows to the extent an undue punitive award essentially enriches plaintiffs who achieve a judgment embodying the equivalent of compensatory damages attributable to victims who do not sue in respect of the same unlawful conduct, or who succeed first in time at the expense of other prevailing parties whose later judgments could turn out uncollectible because the first filers may have effectively impoverished the defendant. *See, e.g., Gore*, 517 U.S. at 593, 116 S.Ct. 1589 (Breyer, J., concurring); *Roginsky* 378 F.2d at 839–40.

Conversely, the possibility of visiting utter ruin upon a defendant by means of substantial penalties, however genuine or tenuous the asserted grounds, may induce other plaintiffs hardened by intense vindictiveness, to cling to their punitive hopes and engage in scorched-earth tactics in support of claims that litigants less driven by inflated vengeful impulses may be more inclined to resolve.

### f. *Overdeterrence*

Punitive damages awards larger than necessary to achieve their intended purposes are also criticized for their potential to achieve counter-productive economic effects through overdeterrence, potentially dissuading activities commercially or socially beneficial on account of excessive caution induced among some corporate managers by fear of disproportionate punitive liability. *See, e.g., Gore*, 517 U.S. at 593, 116 S.Ct. 1589 (Breyer, J., concurring)

("[L]arger damages would 'over-deter' by leading potential defendants to spend more to prevent the activity that causes the economic harm ... than the cost of the harm itself."); *Browning–Ferris*, 492 U.S. at 282, 109 S.Ct. 2909 (O'Connor, J., concurring in part and dissenting in part) ("The threat of such enormous awards has a detrimental effect on the research and development of new products."); *see also* Sunstein, Kahneman and Schkade, *supra*, at 2077 ("[A] risk of extremely high awards is likely to produce excessive caution in risk-averse managers and companies. Hence unpredictable rewards create both unfairness and ... inefficiency, in a way that may overdeter desirable activity.") (citations omitted).

#### g. *Defendant's Wealth*

■ The economics of punitive damages reflect other peculiarities of civil penalties not permissible in criminal punishment that serve further to underscore the anomalous distinctions between the two punitive regimens. Evidence of the defendant's wealth, an issue very much in contention in the case at hand, is considered relevant and admissible to inform the jury in fixing the appropriate amount of a punitive award. *See TXO*, 509 U.S. at 462 n. 28, 113 S.Ct. 2711 (noting that under well-settled law evidence of the defendant's net worth is typically admissible in assessing punitive damages) (citing *Haslip* 499 U.S. at 21–22, 111 S.Ct. 1032); *see also Gore,* 517 U.S. at 591, 116 S.Ct. 1589 (Breyer, J., concurring); *Newport,* 453 U.S. at 270, 101 S.Ct. 2748; Restatement (Second) of Torts § 908(2) (1979). The rule is presumably warranted on comparative equity and economic grounds on the theory that, in order to inflict a similar amount of punishment and effective deterrence it requires a higher extraction of money from a wealthy person than from a poor one. *See, e.g., Brown-ing–Ferris,* 492 U.S. at 300, 109 S.Ct. 2909 (O'Connor, J., dissenting) (" 'The value of money itself changes from a thousand causes; and at all events, what is ruin to one man's fortune, may be a matter of indifference to another's.' ") (quoting 4 William Blackstone, *Commentaries* 371). But what may be justifiable for one purpose may yield pernicious consequences for another. Evidence of the extent of the defendant's wealth may also be employed by juries as occasion to display their personal notions of munificence, to apply not the law but largesse. *See TXO,* 509 U.S. at 464, 113 S.Ct. 2711 ("[T]he emphasis on the wealth of the wrongdoer increased the risk that the award may have been influenced by prejudice against large corporations...."); *Newport,* 453 U.S. at .270–71, 101 S.Ct. 2748; *see also* Clarence Morris, *Punitive Damages in Tort Cases,* 44 Harv. L.Rev. 1173, 1191 (1931). ("It is a good guess that rich men do not fare well before juries, and the more emphasis placed on their riches, the less well they fare.").

#### h. *Indemnification*

A related dimension of the defendant's wealth arises in connection with other considerations, also in contention here: the availability and relevance of insurance covering punitive damages, and indemnification agreements and vicarious liability principles that effectively enable individual defendants found liable to transfer the impact of punitive damages to their employers, corporate shareholders or other third persons, thereby, as to such wrongdoers, blunting if not altogether shifting the intended punitive sting and deterrent purpose of the verdict.

#### i. *Limitations of Judicial Review*

Though safety valves exist to redress the inequities produced by improper puni-

tive awards by means of post-verdict relief from the trial court or on appeal, some legal and practical constraints limit the scope of available relief in many situations. Courts are generally loathe to tamper with jury verdicts except in cases where the error is manifest or the misuse of the factfinder's authority is flagrant. Concerns over the division of labor between judge and jury, vigorous and necessary protection of the constitutional domain of the jury in our justice system, and principles of comity recognizing distinct but interrelated jurisdictional zones between federal and state authorities in our dual system of government, serve as powerful impulses that impel judicial deference to jury verdicts rendered in compliance with fair procedures, even while, under the minimal guidance of general instructions, conferring broad discretion to the jury. *See TXO,* 509 U.S. at 457, 113 S.Ct. 2711 ("Assuming that fair procedures were followed, a judgment that is the product of that process is entitled to a strong presumption of validity."); *Haslip,* 499 U.S. at 16, 19–20, 111 S.Ct. 1032; *see also Cooper Indus.,* 532 U.S. at 437 n. 11, 121 S.Ct. 1678 (noting that the determination of the amount of punitive damages is a peculiar function of the jury and should be left to its discretion) (citing *Barry v. Edmunds,* 116 U.S. 550, 565, 6 S.Ct. 501, 29 L.Ed. 729 (1886) and *Day v. Woodworth,* 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1851)); *Newport,* 453 U.S. at 270, 101 S.Ct. 2748 (remarking on "the broad discretion traditionally accorded to juries in assessing the amount of punitive damages.") (citing *Foust,* 442 U.S. at 50–51, 99 S.Ct. 2121; *Gertz,* 418 U.S. at 349–50, 94 S.Ct. 2997). These forces effectively restrain courts' in-

clination to set aside jury verdicts imposing substantial punitive damages.

### j. *Punitive Damages "Crisis"*

The foregoing considerations all come to bear upon the size of punitive damages awards. Whether or not justified by reality or empirically demonstrable, a perception persists that a recent "crisis" concerning punitive damages exists. *See, e.g., Haslip,* 499 U.S. at 18, 111 S.Ct. 1032 ("We note once again our concern about punitive damages that 'run wild' "); *id.* at 61, 111 S.Ct. 1032 (O'Connor, J., dissenting) (noting that "[r]ecent years ... have witnessed an explosion in the frequency and size of punitive awards.") (citing M. Peterson, S. Sarma, & M. Shaley, *Punitive Damages—Empirical Findings,* iii RAND Institute for Civil Justice (1987)); *TXO,* 509 U.S. at 500, 113 S.Ct. 2711 (O'Connor, J., dissenting) (noting that the frequency and size of punitive awards has been "skyrocketing" in recent years, and that "the upward trajectory continues unabated."); *Oki America,* 872 F.2d at 315 (Kozinski, J., concurring); *see also* Sunstein, Kahneman and Schkade, *supra,* at 2075–76 (noting that "[t]he most widespread concern about punitive damages has been that they are unpredictable, even 'out of control.' ") (citations omitted).[19] Various aspects of this debate have reached the attention of the Supreme Court in several recent cases addressing the propriety of certain punitive damages awards that have "exposed the constitutional defects that inhere in the common-law system." *Haslip,* 499 U.S. at 62, 111 S.Ct. 1032 (O'Connor, J., dissenting).

---

**19.** *But see* Rustad and Koenig, *supra,* at 1284 ("There is simply no empirical evidence supporting [the] contention that there is a punitive damages crisis warranting the radical revamping of the remedy."); Owen, *A Punitive Damages Overview: Functions, Problems and Reforms, supra,* at 371–73.

## B. *PUNITIVE DAMAGES JURISPRUDENCE*

The Supreme Court's most recent elaboration of principles governing punitive damages is articulated in *State Farm,* — U.S. at ——, 123 S.Ct. at 1513, a case coincidentally decided after the liability phase of the trial of this action and just three weeks before the commencement of the damages phase. In fact, given *State Farm*'s relevance to the issues before it, this Court, insofar as the recency of the ruling permitted it to do so, endeavored to articulate its concerns in the instructions given to the jury, there reflecting its own reading of *State Farm*'s guidance. *State Farm* and related antecedents of course bear significantly on this Court's deliberations on Defendants' motions challenging the punitive damages verdicts in the instant case.

In those cases, the Supreme Court recognized that "unlimited discretion ... in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Haslip*, 499 U.S. at 18, 111 S.Ct. 1032. The action in *Haslip* involved several claims of fraud grounded on misappropriation by defendant's agents of premiums paid by plaintiffs' public employer for health insurance policies. Defendant's denial of plaintiff Haslip's health coverage caused her doctors to bill her directly for medical services rendered and later to refer her account to a collection agency. In an action against Haslip for nonpayment, the agency obtained a money judgment, thereby adversely affecting her credit. In plaintiffs' action against the insurer, the Supreme Court upheld a jury award of damages to Haslip totaling $1,040,000. Of this sum, the punitive component amounted to approximately $840,000, roughly four times the compensatory damages and 200 times Haslip's out-of-pocket expenses. *See id.* at 6, 23–24, 111 S.Ct. 1032.

While noting that the recognition of punitive damages in American jurisprudence has been longstanding, the Supreme Court acknowledged that it would be "inappropriate to say that ... their imposition is never unconstitutional." *Id.* at 18, 111 S.Ct. 1032. Nonetheless, reviewing Haslip's punitive recovery, the Court found no "constitutional impropriety" in the size of the award and its relationship to compensatory damages and actual expenses. *Id.* at 23, 111 S.Ct. 1032. In this connection, the Supreme Court observed that: "[W]e need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* at 18, 111 S.Ct. 1032. Instead, the Court instructed that "general concerns of reasonableness and adequate guidance from the Court when the case is tried to a jury properly enter into the constitutional calculus." *Id.*

The *Haslip* Court then evaluated the sufficiency of the procedures and guidance that governed the trial and appellate review of the punitive damages award, and endorsed the standards that had been applied by the state courts in the case as sufficiently definite and meaningful to constrain trial courts and juries in awarding punitive damages. Among the criteria the state courts had considered in determining whether the award was excessive or inadequate were:

(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred;

(b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's aware-

ness, any concealment, and the existence and frequency of similar past conduct;

(c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss;

(d) the "financial position" of the defendant;

(e) all the costs of litigation;

(f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and

(g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.

*Id.* at 21–23, 111 S.Ct. 1032; *see also TXO,* 509 U.S. at 460, 462, 113 S.Ct. 2711 (In upholding, by plurality opinion, a jury's punitive award of $10 million where the verdict for compensatory damages was only $19,000, the Court relied primarily on evidence of the magnitude of potential harm that defendant's conduct would have caused, and of "the amount of money potentially at stake, the bad faith of [defendant], the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and [defendant's] wealth . . . .").

In its first such holding, the Supreme Court, in *Gore,* 517 U.S. at 559, 116 S.Ct. 1589, did find a civil punitive damages award grossly excessive, in violation of constitutional due process. There, plaintiff sued BMW alleging that at the time he purchased his new automobile, BMW failed to disclose that the car actually had been repainted. The jury found BMW liable and returned a verdict assessing $4,000 in compensatory damages and $4 million in punitive damages, upon a determination that BMW's nondisclosure policy

constituted "gross, oppressive or malicious fraud." *Id.* at 565, 116 S.Ct. 1589 (citation omitted). BMW defended its nondisclosure practice with evidence that the policy had been in effect since 1983 and complied with applicable statutes in 25 states, on which experience BMW claimed it had long relied.

On appeal, the Alabama Supreme Court found error in the method the jury employed in computing the amount of punitive damages, which took into account the number of BMW's similar sales in other jurisdictions. Though the state court reduced the punitive verdict to $2 million, the Supreme Court found the award, even as remitted, grossly excessive. *See* 517 U.S. at 574, 116 S.Ct. 1589. One of the central considerations in the majority's reasoning was the prerequisite of notice. On this point the Court stated: "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject her to punishment, but also of the severity of the penalty that a State may impose." *Id.* The *Gore* Court then enunciated and applied three "guideposts" by which the state courts were instructed to measure the adequacy of notice concerning the magnitude of the $2 million punitive sanction the state imposed on BMW for adhering to its nondisclosure policy: (1) the degree of reprehensibility of the nondisclosure; (2) the disparity between the harm or potential harm suffered by plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *See id.* at 574–75, 116 S.Ct. 1589.

As a threshold in its application of these standards to the *Gore* facts, the Court asserted: "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehen-

sibility of the defendant's conduct." *Id.* at 575, 116 S.Ct. 1589. As part of its consideration of this standard, the Court observed that some wrongs are inherently more blameworthy than others, that the harm BMW had inflicted on plaintiff was purely economic, and that BMW had not evinced indifference or reckless disregard for the health and safety of others. *See id.* at 576, 116 S.Ct. 1589. Though conceding that in appropriate cases economic injury could warrant substantial penalty, especially when done "intentionally through affirmative acts of misconduct ... or when the target is financially vulnerable," the Court cautioned that not all acts that cause economic harm should be converted into torts sufficiently reprehensible to justify significant punitive sanctions in addition to compensatory damages. *Id.*

With regard to its second guidepost, the *Gore* court observed that the $2 million award upheld by the State, at 500 times larger than the value of the actual harm the jury determined, was "breathtaking," *id.* at 583, 116 S.Ct. 1589, and that there was no evidence that plaintiff or any other subsequent BMW purchaser had experienced any additional harm on account of BMW's nondisclosure policy. *See id.* at 582, 116 S.Ct. 1589. Nonetheless, the Supreme Court, reiterating the stance it articulated in *Haslip*, declined to promulgate any fixed standard to demarcate the point at which the ratio of punitive damages to compensable harm crosses into impermissible bounds. Rather, the Court reaffirmed its rejection of the categorical notion that the constitutional line is marked by

any simple mathematical formula comparing compensatory damages to the punitive award. On this point, it noted that:

[l]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id.* at 582, 116 S.Ct. 1589.

In *State Farm*, the Supreme Court again applied the *Gore* guideposts in finding that a punitive damages award of $145 million, in a wrongful death action where full compensatory damages amounted to $1 million,[20] was constitutionally excessive in violation of the Due Process Clause. *See* —— U.S. at ——, 123 S.Ct. at 1521. The Supreme Court's analysis reiterates the criteria promulgated in *Gore* to guide lower courts' assessments of reprehensibility, noting on this score that while the existence of any one factor may not suffice to sustain an award of punitive damages, "the absence of all of them renders any award suspect." *Id.* at 1521, 123 S.Ct. 1513. Significantly, the Supreme Court further instructed that:

It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further

**20.** The jury's original award of $2.6 million in compensatory and $145 million in punitive damages was reduced by the trial court to $1 million and $25 million respectively. On appeal, the Utah Supreme Court reinstated the $145 million punitive award, citing State Farm's "massive wealth," and evidence that because State Farm's reprehensible policy in question was clandestine, it would be punished at most in only one out of every 50,000 cases, and that State Farm could have faced $10,000 in criminal penalties for every act of fraud, as well as the suspension of its license to conduct business in Utah. *See id.* at ——, 123 S.Ct. at 1519.

sanctions to achieve punishment or deterrence. *Id.* (citing *Gore*, 517 U.S. at 575, 116 S.Ct. 1589).

The Court then observed, in applying the *Gore* indices to State Farm's practices, that while State Farm's conduct in handling plaintiff's claims "merits no praise," and justified some penalty, a more modest award would have served the State's legitimate interests in punishing and deterring culpable behavior. Critical to the Supreme Court's considerations in finding error in the state court's reprehensibility analysis was evidence that the case was used by the state "as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country,"—practices that may have been lawful in other states where State Farm conducted business—rather than for the specific wrongful conduct that the jury found harmful to the plaintiffs. *Id.* at 1521–22, 116 S.Ct. 1589.

Reviewing the second *Gore* guideline, the Supreme Court again declined to prescribe a fixed ratio between compensatory and exemplary damages beyond which a punitive award would be considered excessive. Nonetheless, the *State Farm* Court, in unequivocal intimations, articulated how far out the relative size of punitive awards may constitutionally journey before crossing the stygian border line that ushers into the underworld of penal excessiveness, improvidence and error: "Our jurisprudence and the principles it has *now* established demonstrate ... that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at ——, 123 S.Ct. at 1524 (emphasis added). In support of its suggested curbs, the Supreme Court referenced extensive legislative history providing for double, triple or quadruple damages to deter and punish, multiples that the Court found "instructive", even if not binding. *Id.* (citing *Gore*, 517 U.S. at 581, 116 S.Ct. 1589).[21] In this connection, the Court reinforced that: "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution...." *Id.*

Still, the Supreme Court qualified its single-digit caution with a proviso recognizing that higher ratios might yet comport with due process in exceptional cases where " 'a particularly egregious act has resulted in only a small amount of economic damages,' " and where " 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.' " *Id.* (quoting *Gore*, 517 U.S. at 581, 116 S.Ct. 1589). The Court then capped its discussion of the compensatory-punitive award relationship with an observation particularly apt to the facts of the case at hand. "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*

■ The Supreme Court's treatment of punitive damages in *State Farm* and *Gore* signal unequivocally that the Due Process Clause serves to constrain jury and court discretion over both the severity of recognized misconduct for which punitive damages may be imposed and the amount of such penalty that may be constitutionally awarded for particular offenses. Less clear in the determination of the permissi-

---

**21.** The *Gore* Court noted that current federal law allows or mandates imposition of multiple damages for a wide assortment of offenses, including violations of antitrust laws, the Racheteer Influenced and Corrupt Organizations Act, and breaches of the trademark and patent laws. *See* 517 U.S. at 581 n. 33, 116 S.Ct. 1589.

ble bounds of punitive awards, given the incipiency of these doctrinal guidelines matching extreme civil misconduct with proper penalties, is the assessment of how far is too far and how much is too much. The guideposts the Supreme Court propounded in recent cases, viewed against the backdrop of the punitive remedy's history and evolution, provide a framework for that review.

The initial focus of the task, in this Court's consideration, should be the aspect of disparities and disproportions discussed above. As stated, a proper award of punitive damages reflects an inherent element of disproportionality that serves as a counterweight, offsetting the equally discrepant social imbalances and distortions the wrongdoer's extreme malfeasance engenders. A punitive remedy may become excessive at the point at which it works to overcompensate. In other words, a penalty exceeds its warrant and purpose when, rather than correcting the personal and social disruptions associated with reprehensible deeds—even if by means of an admittedly rough reckoning—it further disturbs the pertinent equities and compounds the mischief. By enlarging the offense, a disproportionally large sanction, like an image in a curved mirror that distorts as it magnifies, requites excess with excess, answers outrage with outrage, and thus introduces into the initial imbalance created by the offense that the verdict sought to redress yet another form of discrepancy: the fact-finder's own aberrant, disproportionate behavior.[22]

■ The generalities reflected in this proposition find more tangible expression in the various considerations the Supreme Court has articulated as hallmarks of penal excessiveness, elements to be weighed in judicial assessments of the propriety and outer limits of punitive damages awards. The factors may be classified in accor-

---

**22.** The disparities may occur not necessarily on account of nefarious designs or purposeful derelictions of duties on the part of trial courts or jurors. Rather, as is evident from the discussion here, the matrix of considerations relevant to the assessment of the proper degree of retribution and deterrence called for to redress a particular wrongdoing is complex and extensive. Despite the labyrinthian design that defines the jury's task in this regard, the skeletal instruction jurors receive is not always sufficiently calibrated to take account of all the fine points and pertinent distinctions that may enter into and adequately shape or constrain the size of a punitive award. To the combination of a highly intricate function amid imprecise guidance, is added the third dimension of this quandary: the jury's vast latitude to decide the size of the compensation and corresponding penalties they assess.

Given their broad discretion in this elaborate context, as a general matter some jurors may easily conflate the purposes of the remedial awards they render. They may overstate or understate the weight of a particular factor, or not sufficiently fine-tune application of a given standard, so as to differentiate, among the aggravating considerations that necessarily expand reprehensibility, which of them should properly yield larger penalties. In consequence, some punitive awards may be larger than necessary because they may not adequately distinguish between, for example, punitive damages in respect of misconduct that involves malicious acts motivated by animus in a personal relationship and causing severe physical injuries, and awards for harms that arise out of a purely commercial transaction and produce primarily economic damages; or between penalties imposed to redress injuries to a single plaintiff as opposed to awards rendered to remedy multiple actual or potential claims and much more extensive public and private harms. Conceivably, some jurors who may have heard anecdotal accounts of other large verdicts might be swayed to rely upon those numbers as a yardstick of what their broad latitude would allow, without the benefit of the entire range of relevant variables that might account for unique differences that may have justified greater penalties in other well-publicized cases and that may compel distinct treatment of the verdict before them.

dance with: (a) the reprehensibility of the underlying offense determined by (i) the characteristics of the acts constituting misconduct, (ii) the type and extent of the pertinent injuries, actual and potential; and (iii) the nature of the parties and their relationships to each other and to the alleged unlawful conduct giving rise to the action;[23] (b) the proportionality of the punitive award in relation to the relevant harms and the compensatory damages the verdict allocates to redress them; and (c) aggravating or mitigating circumstances or conduct, including those arising during the course of the underlying litigation or other related proceedings.

## 1. Reprehensibility

### a. Misconduct

As regards misconduct as a component of reprehensibility, *Gore* leaves no doubt that the degree of culpability embodied in the defendant's conduct represents the point of departure for the analysis of excessiveness of a punitive award. *See* 517 U.S. at 576, 116 S.Ct. 1589. Other Supreme Court guidance elaborates various circumstances that define wrongdoing sufficiently blameworthy to justify civil penalties: whether the malfeasance inflicting injury is characterized by affirmative acts of misconduct such as committing violence, or more depraved states of mind, such as intentional malice, bad faith, trickery and deceit, wantonness, gross recklessness, conscious or deliberate indifference of the health or safety of others; whether the offense is part of a pattern of similar wrongdoing of substantial duration or frequency, rather than an accident or isolated incident; whether the extreme misdeeds entail repeated acts known by the offender

to be unlawful or from which he derived substantial illicit profits. *See id.* at 576–77, 116 S.Ct. 1589; *see also State Farm*, —— U.S. at ——, 123 S.Ct. at 1521; *TXO*, 509 U.S. at 462, 113 S.Ct. 2711; *Haslip*, 499 U.S. at 21–22, 111 S.Ct. 1032.

The *Gore* Court reversed the judgment before it because, in the final analysis, it could not accept the State court's conclusion that "BMW's conduct was sufficiently egregious to justify a sanction that is tantamount to a severe criminal penalty," and that a lesser punishment would have been inadequate to achieve the State's valid retributive and deterrent interest. 517 U.S. at 585, 116 S.Ct. 1589; *see also State Farm*, —— U.S. at ——, 123 S.Ct. at 1521 (noting while defendant's practices may have merited punitive damages "[a] more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives").

In *State Farm*, the Supreme Court provided further guidance relevant to the types of misdeeds underlying the reprehensibility analysis. The defendant's conduct sanctioned by punitive damages must be that which actually injured the plaintiff, and not other unrelated acts committed at other times and places. *See* —— U.S. at ——, 123 S.Ct. at 1524 ("The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20–year period.") Accordingly, the relevant wrongdoing may not include "dissimilar acts, independent from the acts upon which liability was premised … A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *Id.* at

---

**23.** The parties here argue over whether *State Farm* enumerates four or five factors to be weighed in assessing reprehensibility. This Court reads the specific considerations the *State Farm* Court enunciated as sub-categories of the three elements classified here. *See* —— U.S. at ——, 123 S.Ct. at 1521.

——, 123 S.Ct. at 1523. For purposes of this inquiry, the punitive damages awarded cannot take into account "other parties' hypothetical claims against a defendant...." *Id.* Thus, a punitive remedy cannot embody multiple awards of damages relating to the same conduct. *See id.*

### b. *Injuries*

Concerning the relevant injuries considered the second element in determining the degree of reprehensibility, the plurality in *TXO* recognized that in assessing the degree of disparity between compensatory damages and the punitive remedy imposed, it is appropriate to consider not just the actual loss the victim suffered, but "[t]he magnitude of the *potential harm* that defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." 509 U.S. at 460, 113 S.Ct. 2711 (emphasis in original). *State Farm,* however, qualifies the range of permissible disparity between compensatory and punitive awards by suggesting in quantitative terms that single-digit multiples are more likely to satisfy due process. *See* — U.S. at ——, 123 S.Ct. at 1524.

Qualitatively, *State Farm* further elaborates on relevant distinctions that may be weighed in appraising the nature and extent of the pertinent harm. The consider-

ations include whether the injury is caused by violent acts, is economic as opposed to physical or emotional trauma or mental distress, is hard to detect because it may be purposely concealed, or is difficult to quantify, especially when it relates to non-economic harm. *See id.* at ——, ——, 123 S.Ct. at 1521, 1524.

### c. *Nature of the Parties and Their Relationship*

A third component that enters into the assessment of reprehensibility is the nature of the parties and the relationships between them. This consideration recognizes that the manner in which parties to a transaction or event are related, as well as the strength of their ties, may bear significantly on the degree of severity ascribed to particular wrongdoing. It is commonplace principle that an act, even if deemed boorish and offensive, may be non-actionable in one relationship or set of circumstances, yet give rise to potential liability and punishment in another context.[24] Several particulars are notable in this regard: the character and closeness of the relationship itself, the parties' comparative power, their relative knowledge and involvement with regard to the operative events, and the role of third parties. Extreme misconduct that arises from a close personal, or business connection and that compounds a wrong with betrayal, that enlarges injuries through violations of con-

---

24. *See, e.g., Oncale v. Sundowner Offshore, Servs. Inc.,* 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (in sexual harassment cases the inquiry into whether allegedly discriminatory conduct is actionable "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.... The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.")

In an illustration that underscores the overarching relevance and import of context as it affects the legal classification of particular behavior, the *Oncale* Court remarked: "A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office." *Id.* at 81, 118 S.Ct. 998.

fidence and trust and breaches of fiduciary obligations, ordinarily is ranked higher in the scale of blameworthiness because the offense strikes at the very essence of the parties' relationship. *See, e.g., Smith v. Lightning Bolt Prods.*, 861 F.2d 363, 373 (2d Cir.1988) (holding punitive damages permissible, under New York law, against defendant lawyer and defendant boxing promotion company because they had "violated the duties that arose from their relationships of trust and confidence with [the plaintiff boxer] and so grossly disregarded those duties that their conduct exhibited a high degree of moral culpability").[25]

But even in a less intimate, or nonexistent prior relationship, the level of culpability associated with misbehavior may vary as a function of significant disparities in the parties' respective positions in the relationship, such as, for example, when the wrongdoer misuses disproportionate power or greater knowledge of the facts and thereby takes advantage of the victim's relative innocence, dependence or other weaknesses specific to the circumstances. *See, e.g., Lee v. Edwards*, 101 F.3d 805, 810 (2d Cir.1996) (holding punitive damages permissible against defendant police officer because, among other reasons, the officer "exercised an authority backed by the weight and force of state power"); *Zarcone v. Perry*, 572 F.2d 52, 53, 57 (1978) (upholding punitive damages award against former judge who, after drinking unsavory coffee, ordered the coffee vendor brought to chambers in handcuffs for a "pseudoofficial inquisition").

In either event, the reverse scaling of misconduct results as the circumstances change. Thus, the grade of reprehensibility that attaches to particular unlawful acts may be mitigated by the extent to which the parties are well known to each other, have had prior dealings and are engaged in an arms-length transaction, and the victim has some degree of knowledge, sophistication or involvement in respect of the events producing the harms at issue. In a similar vein, the interests and material roles of third parties may enter into the equation between the principal parties to the transaction. This third dimension may have a substantial effect in the overall attribution of causal responsibility as between the parties and alter the balance of the particular equities upon which the resultant degree of reprehensibility may depend.

In considering the relationships element, therefore, relevant inquiries may include: whether the parties are individuals or corporations and whether their underlying dealings derived from a business or personal relationship; whether the misconduct and injuries at issue arise solely from that relationship; the relative strength, knowledge and roles of the parties and of third parties in engendering the event or transaction that is the subject of the unlawful acts in question. These factors take account of any lopsided imbalances in the parties' relative social or economic power, in particular the wrongdoer's wealth or "financial position," *see TXO*, 509 U.S. at 462 n. 28, 113 S.Ct. 2711 (citing *Haslip*, 499 U.S. at 21–22, 111 S.Ct. 1032), and the victim's financial vulnerability, *see Gore*, 517 U.S. at 576, 116 S.Ct. 1589. They also weigh the extent to which the injuries redressed by the punitive award are solely those suffered by the plaintiff or may improperly reflect added penalties stemming from the defendant's being generally perceived as "an unsavory individual or business," or from specific wrongdoing harmful

---

**25.** In fact, in some jurisdictions, breach of fiduciary duty is an exception to the general rule that punitive damages are not recoverable for breach of contract claims. *See, e.g., Kubin v. Miller*, 801 F.Supp. 1101, 1122 (S.D.N.Y.1992) (applying New York law).

to hypothetical third parties. *State Farm,* —— U.S. at ——, 123 S.Ct. at 1523.

### 2. *Proportionality*

The proportionality principle, requiring that a punitive sanction bear a reasonable relationship to the degree of harm the wrongdoing actually or potentially inflicted, serves a frontline tell-tale role. It informs the excessiveness inquiry of the normative and quantitative judgments pronounced by the fact-finder about the gravity of the wrongdoing at issue. The ratio of penalty to injury also serves to alert whether the scale of the remedy properly reflects the purposes it seeks to achieve. Through this function, the proportionality ratio may raise a red flag, serving as a warning sign of arbitrariness or caprice, as when extraneous, improper influences—passion, partiality, corruption— may have entered into the assessment of damages. *See Oberg,* 512 U.S. at 422–423, 114 S.Ct. 2331.

The magnitude of compensatory damages awarded for a particular offense is pertinent to the analysis of excessiveness on two grounds. First, the extent of actual or potential injuries inflicted by extreme wrongdoing may shed light on the degree of culpability reflected in defendant's state of mind and thus serve as an index of the severity of the underlying misconduct. Second, the size of the compensatory award may reflect the extent to which components of the same harm may also have been incorporated in punitive damages, and thus represent duplicative penalty and multiple recovery for the same injury. *See State Farm,* —— U.S. at ——, 123 S.Ct. at 1525.

### 3. *Aggravating or Mitigating Circumstances*

### a. *Similar or Related Misconduct*

This criterion encompasses a defendant's similar acts of wrongdoing previous-ly committed, and other related misconduct or events that may have occurred after the offense at issue, as well as actions taken during the course of the underlying litigation that may demonstrate a continuation of the offender's same course of conduct, intent, bad faith or other relevant states of mind. Such additional behavior may serve to enlarge the amount of any punitive award the fact-finder considers in fixing the scope of the remedy. Specifically, these factors may include the costs and other burdens associated with litigation, as indicators of the extra dimensions of losses that defendant's intentional misbehavior visits upon plaintiff through the need to litigate the wrongs at issue, and, by the same token, the incentive essential to to induce plaintiffs to prosecute wrongful behavior. *See Haslip,* 499 U.S. at 21–22, 111 S.Ct. 1032; *see also* Rustad and Koenig, *supra,* at 1322–24; Owen, *Punitive Damages in Products Liability Litigation, supra,* at 1287–90. The aggravating and mitigating considerations may also recognize the extent to which defendant's particular misconduct that caused plaintiff's harm continues or is effectively deterred by the onset of litigation. *See, e.g., Gore,* 517 U.S. at 579, 582, 116 S.Ct. 1589 (noting that there was no evidence that defendant had persisted in the course of conduct after it was declared unlawful in another civil action, or that plaintiff or any other customer had been threatened with any additional harm by defendant's offending business policy).

### b. *Penalties in Comparable Cases*

From a defendant's perspective, on the other hand, punishment for the same misconduct already imposed by criminal sanctions or civil penalties in other proceedings, *see Haslip,* 499 U.S. at 22, 111 S.Ct. 1032, or evidence that the same policies or

practices are lawful in numerous other jurisdictions, may be taken into account as potential mitigation of a punitive award. *See Gore,* 517 U.S. at 570, 572, 578–79, 116 S.Ct. 1589 (noting from broad diversity of state policies addressing disclosure of pre-sale automobile repairs that "reasonable people may disagree about the value of the requirement"; that states may not impose sanctions in order to deter a wrongdoer's conduct that is lawful in other jurisdictions; and that defendant could reasonably have relied on generally prevailing state standards in guiding its policies); *see also State Farm,* —— U.S. at ——–——, 123 S.Ct. at 1522–23.

These considerations may serve to demonstrate that if the offending behavior is one about which reasonable people may differ, and no uniform consensus exists about its unlawfulness, the degree of reprehensibility ascribed to it should decline, correspondingly diminishing the severity of penalties that the misconduct may reasonably warrant.

## C. *APPLICATION OF PUNITIVE DAMAGES DOCTRINE TO THE INSTANT CASE*

█ As drawn above, the numerous considerations of functions and constraints, the interplay and tensions of rights and remedies that combine to shape a proper punitive sanction, may be conceived as a multi-dimensional grid of interrelations and variables. The Court next considers where in this framework the relevant coordinates would place Defendants' wrongdoing.

Defendants argue that the underlying conduct for which the jury found them

liable to TVT was not sufficiently reprehensible to justify any of the punitive remedies imposed. The Court disagrees. Its reasoning is detailed in the Court's accompanying Post–Trial Motions Decision, *supra.* The Court also addressed these issues thoroughly in denying Defendants' previous motions raising the same theories and objections. *See* decisions cited *supra,* note 2. The question remaining is whether Defendants' wrongdoing was culpable enough to support the size of the punitive verdict rendered here. In light of the preceding historical context and jurisprudence defining the punitive damages doctrine as it applies today, the Court concludes that the penalties the jury imposed in this case are excessive.

### 1. *The Jury Instructions*

As a starting point for its analysis, the Court reviews the instructions given to the jury pertinent to its consideration of punitive damages. The Court's charge in this regard (*See* Transcript of the Damages Trial ("Damages Tr."), at 1277–87,[26] contained guidance concerning the remedy generally, as well as more detailed provisions describing standards and elements specific to the particular claims at issue. The general charge advised the jury that punitive damages may be awarded only for malicious and reckless acts, defined as those "done in such a manner, and in circumstances, as to reflect utter disregard for the potential consequences of the act and safety and rights of others, or if such act is done deliberately with knowledge and utter disregard of the rights of the party making the claim and with intent to interfere with those rights." (Damages

---

**26.** These instructions derived primarily from the New York Pattern Jury Instructions and the Modern Federal Jury Instructions, taking into account, as appropriate, the parties' proposals and comments. *See* 2 *New York Pat-* *tern Jury Instructions–Civil* PJI 3:20, at 170–71 (2d ed.2003); 4 L. Sand, *et al., Modern Federal Jury Instructions,* Instr. 77–5, 86B–20 (2003).

Tr. at 1277–78). The Court then described the purposes of punitive damages, stating that the remedy is designed to punish particular persons for committing especially shocking and offensive misconduct and to deter those parties and others from committing similar acts. Specifically addressing the requisite state of mind that is common to each of TVT's claims for punitive damages under consideration, the instructions counseled that as to those claims, such penalties are appropriate in limited circumstances involving conduct characterized as gross, wanton or willful, or that otherwise evinces high moral culpability or was actuated by morally reprehensible motives. (*See* Damages Tr. at 1280.)

The jurors were told that the awarding of punitive damages was within their discretion, that they were not required to impose such a penalty, but that if they did decide to do so, in setting the amounts the determination "must be guided by reason, sound reason, and a fair sense of justice—it must not reflect bias, prejudice or sympathy toward any party." *Id.* at 1278. The Court indicated that the amount of the award could be as large as the jury believed to be appropriate under the circumstances of this case and to fulfill the purposes of the remedy earlier mentioned.

The Court, however, reflecting the teaching of *State Farm, Gore,* and the other recent Supreme Court rulings on the subject, cautioned the jury that while a punitive award could be as large as it deemed necessary to fulfill the retributive aims of punitive damages, the jury's discretion was not without constraints. In particular, the Court stated that:

> While there are no rigid benchmarks, *the measure of punishment must be reasonable and proportionate to the amount of harm that plaintiffs have established and for which you decide to award damages,* and must be based upon the facts of a[sic] particular circumstances associated with the severity of each defendant's conduct established by the evidence, as well as upon any other considerations these instructions indicate you may take into account.

*Id.* at 1279 (emphasis added).

### 2. *Application of Functions and Variables*

The Court next considers the extent to which the jury, in light of its instructions, properly considered the various factors discussed above that enter into the punitive damages calculus.

### a. *Reprehensibility*

### (i) *Misconduct*

On the trial record here, the jury found, and the Court concurs, that there is sufficient evidence upon which Defendants' conduct could be found extreme enough to support punitive sanctions. The guideposts endorsed by the Supreme Court in the reprehensibility analysis governing punitive awards recognize that misconduct involving fraud and evincing intentional malice, bad faith, concealment, and trickery and deceit, suffice to justify imposition of punitive sanctions. *See State Farm,* —— U.S. at ——, 123 S.Ct. at 1521; *Gore,* 517 U.S. at 576, 116 S.Ct. 1589; *see also TXO,* 509 U.S. at 462, 113 S.Ct. 2711; *Haslip,* 499 U.S. at 21–22, 111 S.Ct. 1032. The jury here found the evidence compelling enough to support punitive remedies for fraud by fraudulent concealment, the prerequisites of which, as the jury was instructed, include an element of offensive misconduct characterized as malicious, willful or wanton, or driven by morally reprehensible motives. The evidence satisfying this standard is thoroughly addressed in the Court's rulings denying Defendants' other related motions. *See*

Post–Trial Motions Decision, *supra*, slip op. at 20–22, 29; *see also TVT Records*, 262 F.Supp.2d at 191–98. The Court reiterates its conclusions there expressed and finds no reason to revise its prior determinations in this regard. Insofar as that evidence bears upon the Court's consideration of the instant motions, the relevant aspects are summarized below.

Although Defendants' offense pertained to a single transaction between them and TVT, the evidence indicates that the act of concealment of Defendants' approval in question continued for a period spanning almost one year during which Defendants, while withholding their consent to the Side Letter Agreement between IDJ and TVT, were negotiating renewal of IDJ's business agreements with Irv Gotti ("Gotti") and Ja Rule (together with Gotti previously defined as the "Artists"). From these circumstances, a rational jury could draw a reasonable inference, as TVT argued, that Defendants had entertained the arrangement with TVT not as a good faith venture, but as a way to placate the Artists and string TVT along until IDJ's contracts with the Artists' were concluded. The evidence demonstrated that Defendants knew or should have known that TVT had changed its position in reliance on Defendants' earlier representations that IDJ had consented to TVT's Heads of Agreement with the Artists relating to the recording and marketing of the CMC Album. Moreover, various junctures arose which presented Defendants with opportunities to apprise TVT that they actually had no intention of honoring their promises of cooperation and assent for the CMC Album project to proceed.

In addition, a rational jury could reasonably have found that, in the face of awareness that TVT had commenced investing financial and other resources pursuant to the Heads of Agreement, and that the Artists had done so as well, Defendants affirmatively sought to induce Gotti and Ja Rule not to complete their obligations to TVT under the Heads of Agreement to produce the CMC Album, and instead to obtain the recording for release by IDJ rather than by TVT. The quantity, consequences and duration of these actions qualify them as sufficiently severe to warrant a reasonable finding that the conduct was characterized by intentional malice, bad faith, concealment, trickery and deceit sufficient to justify an award of punitive damages under current conception and application of the doctrine. The form, time span and virulence of this wrongdoing cannot be deemed conduct about the culpability of which reasonable people may differ. *See Gore*, 517 U.S. at 578–79, 116 S.Ct. 1589. In fact, such egregious misdeeds fall within the scope of malfeasance long and uniformly condemned and punished by punitive sanctions in actions for fraud, tortious interference with contractual relations and certain breaches of contract. *See generally, TVT Records*, 262 F.Supp.2d at 198–204 (Appendix) (compilation of cases).

**(ii)** *Injuries*

Having said what Defendants' conduct entailed, it is essential to state what it did not, as part of the next aspect of the reprehensibility inquiry—examining the extent of the injuries inflicted by the particular wrongdoing that justified a finding of liability. Defendants' unlawful behavior was not marked by violence or threats of violence, nor did it entail infliction of severe physical injury, trauma or emotional distress to one or more individual victims. *See State Farm*, —— U.S. at ——–——, 123 S.Ct. at 1524–25. Rather, the injuries inflicted here comprised solely of economic losses suffered by a business entity predominantly in the form of diminished profits and goodwill. This harm involved but one victim and, once discovered, the scope

of its effects could be fully ascertained; the monetary value of the injury was thus readily quantifiable. This case, therefore, does not implicate a consideration that in many cases ranks high in the reprehensibility analysis and typically produces large punitive awards: concurrent injuries not only to the plaintiff who litigates the underlying action, but to multiple other unknown victims that are undetectable or difficult to calculate, and from which the wrongdoer potentially derives considerable unjust profits the disgorgement of which could be compelled by a substantial punitive award to a successful victim. Finally, the injuries found here did not arise in the context of the production of goods or services that created risk of potential harms to the health, safety or environmental interests of multiple other potential victims or of the public in general.

To be sure, the Supreme Court has instructed that infliction of economic injury can warrant a substantial penalty, "especially when done intentionally through affirmative acts of misconduct ... or when the target is financially vulnerable." *Gore*, 517 U.S. at 576, 116 S.Ct. 1589. (internal citation omitted). In this regard, TVT argues that, as the jury's verdict found and the Court has reaffirmed, the injuries TVT suffered were in fact committed through Defendants' affirmative acts of misconduct, specifically, consenting to the production of the CMC Album with no intention of satisfying this obligation. TVT also contends that it was "financially vulnerable" at the time of Defendants' wrongful acts. However, other circumstances, discussed below, blunt the force of TVT's arguments and diminish the merit of its claim that the economic harm TVT suffered here justifies the "substantial penalty" the jury's verdict imposed. *Id.*

#### (iii) *Relationships*

The pertinent relationships among the parties, as well as the various social and economic dimensions that characterize the underlying events in this case, exist at different levels. These nuances may cut both ways in the punitive damages excessiveness inquiry. To the extent the double edge creates some doubt, the net weight of this consideration tilts toward a lower gradation of reprehensibility, and hence a reduced scale of justifiable retribution.

As an initial matter, what the pertinent relationships in this case are must be distinguished from what they are not. The case at bar does not involve the fact patterns generally prevailing in mass torts, products liability, environmental nuisance and large-scale consumer fraud litigation. Ordinarily, those actions entail the production of dangerous, defective or false goods or services. The marketing of those products usually occurs through unitary business-to-individual or business-to-business transactions among strangers or persons only loosely acquainted. In addition, the manufacturer or seller engages in business practices that create health or safety hazards not just to the particular victims, but to the public in general. These prototypical situations engender the great disparities in the resulting factual array—the extensive actual and potential injuries in relation to the modest cost of prevention, the substantial differences in social and economic power between the parties, the vast profits to be garnered from unvindicated wrongs, the enormity of the offenses magnified by the combination of these effects—that are likely to yield sustainable large penalties when extreme misconduct produces harms.

By contrast, here the most basic connection, the one from which the injury that gave rise to the action derived, was a commercial relationship between competitors in the same industry, and the parties'

dispute in fact is integrally grounded on aspects of that competition. In addition, both on a business-to-business and on a personal level, the parties were no strangers to one another. Cohen and Steven Gottlieb ("Gottlieb"), TVT's principal owner and chief executive, had known each other professionally for about fifteen years and had experienced prior business conflicts and interactions during that time. Gottlieb testified that James Iovine, a high-ranking executive at Universal,[27] was a personal mentor and confidant, one of his closest friends in the industry, and one person with whom he had discussed ways of amicably resolving the parties' dispute. TVT also had a contractual relationship with a Universal entity for the distribution of certain TVT products, including the CMC Album, in European markets.

Invoking the exception *Gore* recognizes as supporting higher penalties "when the target is financially vulnerable," 517 U.S. at 576, 116 S.Ct. 1589, TVT points to and recasts elements of these relationships in a manner that endeavors to embrace some of the disproportions at the core of punitive damages remedies. Essentially, TVT portrays the confrontation here as a version of the fabled battle of David and Goliath.

By TVT's account, here paraphrased impressionistically, TVT is a small enterprise, individually owned, operating an independent record label. As an outlet for the discovery and nurturing of new artistic talent and emerging art forms that can find no easy access or hospitable welcome among the remote corporate monoliths like UMG Recordings, Inc. that dominate the market, TVT lays claim to an important competitive service it renders to the re-cording industry and the public. IDJ, on the other hand, is presented as one arm of UMG Recordings, Inc., which is part of the Universal Group in California—comprising the largest music recording company in the world—which in turn is owned by Vivendi International headquartered in Europe, which publishes music and operates water plants in France, among countless other goods and services the vast enterprise offers in worldwide operations the exact structure and connections of which UMG Recordings's own executives could not comprehensively describe to the jury in this case.

TVT describes its encounter with Cohen and IDJ/Universal as a valiant struggle for the survival of one of the few remaining successful independent recording labels. It depicts Defendants as the aggressors, agents of an amorphous empire arrogantly throwing its massive weight around and bringing immense wealth and power to bear down upon a small competitor, threatening the independent's existence or seeking to put it out of business altogether.

Whatever appeal this portrayal may have on the surface, in the final analysis it fails to persuade the Court that there are sufficiently compelling grounds here to justify the size of the punitive award bestowed upon TVT in this case. The evidence does not fully support TVT's market theory of competition, nor TVT's claim to the vulnerability of the ingenue.

The "financially vulnerable" plaintiff factor that *Gore* and *State Farm* refer to as a possible basis for upholding higher damages ratios most likely contem-

---

**27.** The record is not entirely clear as to the precise relationships and corporate hierarchy among the various entities comprising Vivendi International or Vivendi Universal that were alluded to in testimony and documents in this action, or as to the positions held by some of the executives of these companies whose names were mentioned. Accordingly, where the record is unclear, the Court uses the generic name "Universal" or "Universal Group" to refer to whatever may be the proper corporate entity.

plates two generally recognized situations, as described earlier, that date back to the primal roots of the exemplary damages doctrine. At bottom, both derive from encounters in which there are disproportionately large differences in power relationships between the plaintiff and defendant and in which the offender has outrageously misused the prerogatives of wealth, office or social rank to inflict intentional harm on an innocent victim. In the modern analogue, the large corporate malefactors, supplanting the masters and overlords of the early examples, are portrayed as bullies driven by malicious arrogance, greed or reckless indifference, and are pitted against the proverbial "widows and orphans," in the archetypical cases individuals of modest means or minority groups such as the elderly or disabled.[28] In these situations, the plaintiff's relationship with the defendant most commonly involves that of customer, employee, or of a bystander member of the public innocently snarled in the wrongdoer's web.

The second situation, actually a particular offshoot of the first, usually arises out of commercial relationships and implicates disproportions in competitive relationships between an individual or small business plaintiff and the ordinarily more powerful defendant who engages in predatory, anti-competitive practices maliciously designed to deprive plaintiff of his property or livelihood or drive him out of business altogether. See, e.g., Browning–Ferris, 492 U.S. at 260–61, 109 S.Ct. 2909. Antitrust, trademark, copyright, patent and unfair competition laws recognize such predatory, anti-competitive business practices are pernicious enough to justify enhanced penalties measured in multiples of the actual harms the monopolizers and infringers inflict. See Gore, 517 U.S. at 581 n. 33, 116 S.Ct. 1589. Violations of those laws inherently warrant heightened sanctions, legislatively determined as a mark of the society's judgment about the reprehensibility of the practices, by virtue of the harms the offenses wreak both on the particular victims who prosecute the violations, and on all members of the public who are made to pay more for goods and services by reason of the wrongdoer's illicit gains. Absent such harsher sanctions, the extreme misconduct may result in unjust enrichment of the malefactors, whose dishonest business practices otherwise would be rewarded. See, e.g., Browning–Ferris, 492 U.S. at 260–61, 109 S.Ct. 2909.[29]

---

**28.** *See generally* Rustad and Koenig, *supra,* at 1292–96 ("Courts frequently assessed punitive damages against bullies who oppressed the physically weak and socially powerless.... The awarding of exemplary damages was one of the few effective social control devises used to patrol large powerful interests unimpeded by the criminal law.").

**29.** In *Browning–Ferris,* plaintiff had been a local manager of defendant, a subsidiary of a nationwide waste-collection and disposal business. Plaintiff resigned and went into business for himself in competition with his former employer, in time succeeding in capturing a substantial portion of the market previously served solely by defendant. In response, defendant launched a campaign to drive plaintiff out of business, directing the local office to: " '[p]ut [plaintiff] out of business. Do whatever it takes. Squish him like a bug', [and if] 'it meant give the stuff away, give it away.' " *Id.* (citation omitted; internal quotations omitted). Plaintiff's revenues thereafter dropped substantially and he sued defendant for federal antitrust law violations and common law claims of tortious interference with contractual relations. The jury returned a verdict of $51,146 in compensatory damages and $6 million in punitive damages. The trial court trebled the damages and added attorneys fees and costs on the federal claim, or alternatively awarded $6,066,082.74 in compensatory and punitive damages on the state-law claim. Defendant appealed the punitive award as an excessive fine in violation of the Eighth Amendment. The Second Circuit affirmed the judgment as not so dispro-

It is well to recall the ingredients that make awarding substantial exemplary damages in these situations clear and compelling. In the ordinary case the relationship between the parties is relatively straightforward, generally not entailing complications of extensive prior dealings, interests of third parties or related conflicts that may tend to blur the equities. It is thus generally easier to sort out the predicates of the wrong involved, and thereby discern where the merits lie: in simplified form, plaintiff is the innocent victim and the weaker of the parties; defendant is the aggressor and substantially more powerful; the offense is deliberate and does not arise out of any controverted aspect of the parties' relationship or provocation by the victim; the parties' dealings are not arms-length, and so the misconduct is entirely unjustifiable; the injury, whether slight or grave, has no social utility except financial profit or social gain to the wrongdoer. The relative simplicity of this model facilitates the punitive sanction's reprehensibility analysis, and readily guides assessments of the propriety and size of penalties that the underlying relationships and events may justify.

Were these the actual circumstances entirely prevailing in the case at hand, this Court would have little hesitancy acknowledging that a somewhat different calculus, perhaps yielding a different outcome, would be in order. But the pertinent facts surrounding the instant dispute are otherwise. However much TVT depicts itself as "financially vulnerable," it does not neatly fit the contours of the rule, except by a substantial Procrustean stretch.

It is essential to keep a proper perspective on the actual relationships between the parties here, as well as on the real quarrel at hand. At bottom, at issue in this case is a contract dispute and a related copyright infringement claim between two competitors relating to whether proper consent was secured for the services of two IDJ artists who previously had produced or recorded for TVT. While TVT sought a legitimate opportunity to capitalize on the enormous success of its former artists, IDJ expressed concerns about protecting its investment in them. The contracts in question pertained to the recording and production of one album. The infringement, necessarily connected to the contract dispute, pertained to one new song and one old song and video recording. Moreover, the harms caused by Defendants' underlying offenses were suffered by a single plaintiff; any realized and potential gains Defendants have and would have derived reflect direct financial and goodwill harm solely to TVT. While certainly in relation to Universal Group or Vivendi, TVT may be a small rival, in other real-world comparative terms, at a self-appraised valuation exceeding $100 million as of January 2003, TVT was hardly a two-bit player, nor should it be dismissed or bullied as the 98–pound weakling. In fact, there is substantial evidence that, going into the CMC Album transaction with IDJ, TVT, ranked as the largest independent recording label in the country, as well as Gottlieb personally, had business experience and sophistication enough to belie a claim that they were entirely at the mercy of their larger adversaries.

portionate as to be constitutionally excessive even if the Eighth Amendment applied. In the Supreme Court, the judgment was challenged as unconstitutional under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. The Supreme Court held that the Eighth Amendment did not apply to civil penalties and did not rule on the due process challenge because that ground had not been raised in the lower courts. *See id.*

The record contains evidence of tensions that existed between Gottlieb and Cohen arising out of other feuds involving the procurement of timely consents for performances of their artists; of alleged resentments over who deserved the credit for the discovery and success of certain artists; and of perceived jealousies generally grounded on other differences among the parties and their principals concerning personal and business management styles. As described above, TVT also engaged in other dealings and contractual relationships with UMG Recordings, and Gottlieb maintained personal friendships with Universal executives, including Cohen's immediate supervisor. TVT knew that IDJ's consent was essential for the CMC Album project to proceed. To this end, in the Heads of Agreement, TVT not only obligated the Artists to secure IDJ's approval, but made contingency provision in the event they failed to obtain IDJ's assent, in a form of liquidated damages payable to TVT.

Thus, an additional layer of complexity in the pertinent relationships here arises from the vital roles of third parties. The Artists played a major part in engendering, sustaining or enlarging the underlying controversy, and their interests in the transaction often placed them in the middle of the dispute, generating intense pressures on both battling sides, neither of which had any business incentive in offending the Artists. And so, while tiptoeing around the Artists, who to a large extent had put them on the spot in the first place, and treating them gingerly with kid gloves, the adversaries applied brass knuckles to one another, venting their full wrath in this litigation.

These contrapuntal considerations bear upon the punitive damages analysis in substantial if subtle ways. They capture some of the essential gradations that help in identifying the proper place in the finer calibrations of offenses and consequences that determine the propriety and size of a particular punitive award. Amid the complex interconnections that existed among the parties, as well as third parties, and taking into account the climate of prior business dealings, personal rivalries and mutual hostilities in which the transactions at issue here occurred, the parties' treatment of each other cannot fairly and accurately emerge in absolutes, as a portrait in black and white. Rather, under these circumstances, any normative judgment classifying behavior in categorical proportions that in turn yield vastly disproportionate penalties, may signal that the fact-finder did not fully reckon the proper relational frame of reference or that some impermissible weight may have figured in the analysis, thereby tipping the verdict by some unjustifiable degree.

Thus, although the Court finds that reasonable people would not differ that Defendants' treatment of TVT constituted conduct shabby and deplorable enough to deserve some retribution, reasonable people would differ on whether, in the light of all the circumstances giving rise to Defendants' offenses, the wrongs they committed were sufficiently shocking and contemptible to merit, as a calculated response, the size of the penalties the jury actually assessed. This conclusion is especially compelling because the verdict wholly compensated TVT for the entire measure of harms it claimed. *See State Farm,* —— U.S. at ——, 123 S.Ct. at 1524 (noting that in the final analysis "[t]he precise award in any case... must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.").

In sum, as much as TVT may suggest that the dispute here fits squarely into the mold of cases that affirmed punitive judg-

ments in high multiples, this Court is not convinced. Rather, the Court views the overall the circumstances determining the egregiousness of the underlying conduct, the level of harm and the relevant relationships in those cases as not sufficiently analogous to those prevailing in this litigation, and concludes that the excessiveness analysis and outcomes upheld as proper in earlier precedents would not survive here under the more rigorous and constraining guidance only recently propounded in *State Farm.*

### b. *Proportionality*

In some respects, if viewed separately in accordance with particular claims and defendant, the punitive damages assessed by the jury bore disproportionate relationships to compensatory awards in ratios exceeding the single-digit range the *State Farm* Court suggested would comfortably fit within the contours of due process. *See* —— U.S. at ——, 123 S.Ct. at 1524. For example, as regards TVT's breach of contract claim asserted against IDJ, the ratio of the $1 million punitive remedy to the $126,720 total compensatory award is approximately 7.9 to 1. Similarly, with respect to the fraud claim against Cohen, the jury assessed a penalty of $6 million and a compensatory award of $1,011,313, a ratio of roughly 6 to 1. The ratios change if all of the penalties as to each Defendant are aggregated and measured against the compensated injuries of that Defendant, and also if all of the punitive awards against both Defendants are added and compared to the total compensatory damages TVT may recover.

The parties disagree on the appropriate method for determining the applicable ratio. For instance, pertaining to the liability for the tortious interference claim, the jury assessed compensatory damages of $22,358,713 against IDJ and Cohen jointly and severably. As regards this injury, the jury awarded punitive damages of $50,000,000 individually against each Defendant.

Under TVT's analysis, the damages ratio would separately compare the respective penalties imposed against and collectable from each Defendant. By this method, for example, the ratio with regard to the tortious interference claim would be 2.2 to 1 as to each Defendant. Defendants, on the other hand, contend that the proper analysis should compare TVT's compensatory award as to any particular injury to the total punitive awards corresponding to that claim assessed against and separately payable by both Defendants. On this basis, the applicable ratios here would amount to approximately 7 to 1 with regard to TVT's fraud claim and approximately 4.47 to 1 as to the tortious interference claim.

The Court need not resolve this dispute. It concludes that under either set of ratios the jury's awards were excessive.

In absolute terms, the ratios produced by either method would of course fall within the single-digit range the *State Farm* Court suggested would best comport with due process concerns, although, under Defendants' theory, they would be near to or slightly above the 4 to 1 ratio the same Court also declared "might be close to the line of constitutional impropriety." *Id.* (citing *Haslip*, 499 U.S. at 23–24, 111 S.Ct. 1032). In considering this aspect of the inquiry concerning the excessiveness of punitive damages, this Court is mindful that the Supreme Court's instructions on this point still appear somewhat imprecise. While *State Farm*'s quantitative guidance relating to the damages ratio is instructive, it is by no means fine-tuned or rigid. Nor can *State Farm*'s ratio test reasonably be understood to be dispositive. First, the Supreme Court, for the third time in suc-

cessive occasions, disavowed that it was imposing a "bright-line ratio" or "rigid benchmarks" that punitive damages cannot exceed. *Id.* Simultaneously, however, the Court intimated that single-digit multipliers are *"more likely"* to comport with due process, *id.,* and that a punitive sanction exceeding four times the compensatory award *"might* be close" to the constitutional threshold. *Id.* (emphasis added). Also in the same passage, the *State Farm* Court acknowledged, on the one hand, that it had upheld higher ratios under some circumstances and, on the other, that when compensatory damages are high, a lesser ratio, "perhaps" only equal to the amount of the compensatory damages, "can reach the outermost limit of the due process guarantee." *Id.*

As the parties' arguments in this case amply illustrate, these guidelines are far from firm and crystal-clear, and may be read by adverse litigants to accommodate their diametric propositions. It is not the task of this Court to reconcile the extremes that still formative Supreme Court guidance conceivably might accommodate, and pinpoint with greater coherence and unerring precision where *State Farm*'s instructions would apply to reach the constitutional "outermost limit" on punitive damages the Supreme Court adumbrates. It suffices to say that whatever vagueness and tensions *State Farm* seems to reflect, to this Court the ruling's higher frequencies are quite audible; the notes resonate loud and clear concerns, signaling that, at least under the circumstances the case at hand presents, the damages awards that prevail should register at the lower end of the scale.

Most compelling in this regard is application of the Supreme Court's instructions concerning the relative size of the compensatory damages verdict. As more detailed above, compensatory awards, notwithstanding the doctrinal rhetoric, do possess a punitive aspect and may reflect some element of relief that duplicates harm redressed by punitive remedies, in particular when a compensatory verdict fully redresses an injury. *See id.* at ——, 123 S.Ct. at 1521 ("It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."); *see also id.* at ——, 123 S.Ct. at 1525; *Roginsky,* 378 F.2d at 841. Largely for this reason, *State Farm* counsels that "when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." —— U.S. at ——, 123 S.Ct. at 1524; *see also id.* (noting that among the reasons supporting invalidation of the $145 million punitive sanction as excessive, was that plaintiff's $1 million compensatory award for a year and a half of emotional distress was "complete compensation"). Conversely, *Gore* counsels that "low awards of compensatory damages may properly support a higher ratio," for example, "if . . . a particularly egregious act has resulted in only a small amount of economic damages." 517 U.S. at 582, 116 S.Ct. 1589.

Here, the jury's awards of compensatory damages associated with each of TVT's claims for breach of contract, fraud and tortious interference with contractual relations were not only "substantial," they reflected "complete compensation" for the economic injury TVT claimed and overall amounted to the full extent of the damages TVT asserted. *State Farm,* —— U.S. at ——, 123 S.Ct. at 1524. However egregious Defendants' wrongs may have been, they produced large amounts of harms

that were solely economic and all of which were fully recompensed. The aspect of a punitive remedy considered its reparative dimension, and that ordinarily justifies larger awards—intangible, unquantifiable and exceptional losses not fully recognized by compensatory damages—was not present here. TVT stated its injuries to comprise solely economic losses, and was awarded the full amounts it asked for. Consequently, any punitive recovery beyond that amount would be more than necessary to achieve the level of retribution and deterrence appropriate to this case and would constitute a windfall to TVT.

Moreover, insofar as the compensatory award reflected some measure of imprecision and uncertainty always inherent in computations of damages—and on this point the parties' experts differed dramatically with regard to their assumptions and methods for projecting potential sales of the CMC Album had the record been produced—Defendants must bear the risk of that deficiency, a burden that constitutes a built-in deterrent aspect of compensatory damages. Any punitive award disproportionately exceeding TVT's reported losses, given other constraining circumstances evident in this case, would be more than what is necessary to punish and deter Defendants, thus not only representing an undue windfall for TVT, but potentially yielding unintended, overdeterrent consequences. *See Vasbinder,* 976 F.2d at 121; *see also Roginsky,* 378 F.2d at 841 ("[A] sufficiently egregious error as to one product can end the business life of a concern that has wrought much good in the past and might otherwise have continued to do so in the future, with many innocent stockholders suffering extinction of their investments for a single management sin.").

Moreover, the higher ratios correlating to the damages awards the jury imposed in this case serve as telltale signs that any significant penalties assessed beyond complete compensation of the injuries TVT claimed and greater than reasonably necessary to punish and deter, may have been tainted by the jury having given undue weight to secondary considerations such as Defendants' wealth,[30] or to impermissible factors such as prior "dissimilar acts, independent from the acts upon which liability was premised," *State Farm,* —— U.S. at ——, 123 S.Ct. at 1523, or Defendant's affiliations with large and rich parent companies or out-of-state businesses. *See, e.g., United Tech. Corp. v. American Home Assur. Co.,* 118 F.Supp.2d 174, 180 (D.Conn.2000) (finding it improper to use the parent company's net worth as a measure of exemplary damages).

The Court has no direct indications that any of these considerations in fact entered into the jury's deliberations or weighed in its findings. However, the record contains evidence, elicited by TVT, of IDJ's affiliations with UMG Recordings, Inc., the world's largest music recording company and part of the Universal Group, headquartered in California, which in turn is a component of Vivendi International, a global enterprise based in France. A punitive award of the magnitude here imposed, viewed in relation to Defendants' misdeeds and other relevant factors, could have reflected some sense on the jury's

---

**30.** *See Gore,* 517 U.S. at 591, 116 S.Ct. 1589 (Breyer, J., concurring) ("This factor ... is not necessarily intended to act as a significant *constraint* on punitive awards. Rather, it provides an open-ended basis for inflating awards when the defendant is wealthy .... That does not make its use unlawful or inap-propriate; it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct.") (emphasis in original); *see also TXO,* 509 U.S. at 462 n. 28, 113 S.Ct. 2711.

part that Universal Group or Vivendi would stand behind any verdict against IDJ, thus triggering the jury's impermissible redistributive impulse.

TVT also introduced evidence relating to Cohen's net worth, presumably offered to inform the jury's consideration of the range of a punitive award that might have a sufficient deterrent effect on him. On the record at trial, Cohen's total wealth was valued at approximately $29 million. While TVT sought to discredit the accuracy and veracity of Cohen's testimony and statement of assets, the $29 million figure must serve as the starting point to any consideration of the resources Cohen may possess to pay a judgment rendered against him in this case.[31] The jury's verdict against Cohen totaled $23,781,301, jointly and severally with IDJ, in compensatory, and $57,025,000 personally, in punitive damages. It is possible, of course, for the jury to have entirely disbelieved Cohen's testimony and thus to have discounted the record's account of his net worth. But even if the jury did discredit Cohen's representations, the trial record contains no other concrete evidence of any alternative higher valuation of Cohen's net worth that would support a reasonable conclusion that Cohen personally would be able comfortably to absorb the financial impact of a judgment against him totaling $80,806,301.

Consequently, on this basis as well, these circumstances permit other reasonable inferences: that the jury either could have believed that Cohen would be made whole by IDJ or Universal Group or Vivendi—a conclusion not supported by any evidence on the record. Or else, the jury could have determined that Cohen deserved potentially ruinous punishment because his actions towards TVT in this case painted him in a light that, to the jury, to recast the plausible impression in the most

flattering terms suitable, portrayed Cohen as far removed from the role model of an upstanding business citizen or a decent human being.

■ By both his own and his counsel's admission, Cohen behaved badly towards Gottlieb and TVT. (Damages Tr. at 300.) Nonetheless, insofar as the size of the jury's verdict may be significantly out of scale with any evidence documenting the extent of Cohen's ability to pay, the circumstances raise an inescapable inference that the jury's punitive award may have been actuated in some measure by considerations of matters not on the record or by a failure to adhere properly to the Court's instructions. However villainous or shocking a wrongdoer's behavior may be, though certainly a germane consideration in the assessment of a fitting penalty, it does not justify a sanction that on its face appears manifestly disproportionate, oppressive or unjust. *See Vasbinder,* 976 F.2d at 121 (citing *Brink's Inc. v. City of New York,* 546 F.Supp. 403, 413–14 (S.D.N.Y.1982)). Moreover, whatever relative wealth or power an offender may possess, the force driving a penalty cannot be motivated beyond punishment to impoverishment, or calculated not to deter but to paralyze, and utterly to prostrate rather than properly humble the offender into compliance with the law. *See id.* ("[A]n award should not be so high as to result in the financial ruin of the defendant. . . . Nor should it constitute a disproportionately large percentage of a defendant's net worth.") (citing *Lightning Bolt Prods.,* 861 F.2d at 373).

### c. *Aggravating or Mitigating Circumstances*

#### (i) *Other Related Conduct*

Prior to the damages phase of the trial of this action, Defendants took actions pur-

---

**31.** In a discussion below, the Court considers the effect of any indemnification agreement or commitment by IDJ or UMG Recordings benefitting Cohen.

portedly intended to mitigate damages and to signal that they had heard the jury's message in its verdict of liability and had decided to mend their ways. TVT challenged the sincerity and credibility of these efforts and introduced evidence of Defendants' allegedly ill-intentioned eve-of-trial tactics of delivering a partial CMC Album purportedly in performance of the very contract whose repudiation gave rise to this action; of a private investigation of Gottlieb undertaken by an agent hired by Defendants' counsel that allegedly sought to impugn Gottlieb's character; and of the extraordinary litigation costs TVT has had to incur to prosecute this action. This evidence was offered presumably as manifestation not only of the enormity of Defendants' malice and bad faith but also, implicitly, of the continuation of their malignant state of mind—negating their professed epiphany and latter-day penitence—right through the trial.

The Court need not address this issue at length. These matters go substantially to the credibility and good faith of Defendants' efforts, both matters properly within the province of the jury. The Court ruled the evidence relevant and sufficiently probative to be admissible for these limited purposes. *See* Post–Trial Motions Decision, *supra,* slip op. at 49–55. Insofar as the evidence was credited by the jury, the purported mitigation theory Defendants offered could reasonably have struck the panel as belated, and as evincing either largely inept or suspect, or somewhat less than genuinely motivated, efforts to lessen the damage—in either case reinforcing a reasonable conclusion that punitive sanctions were justified to remedy the conduct upon which liability was premised.

### (ii) *Litigation Costs*

The Court next considers the litigation costs here as an aggravating factor warranting punitive damages. *See Haslip,* 499 U.S. at 21–22, 111 S.Ct. 1032. TVT elicited testimony from Gottlieb indicating that, as of the date of his testimony during the damages trial in May 2003, TVT had incurred approximately $3 million in attorneys fees and costs in order to prosecute this action from the time of its commencement on August 20, 2002. This considerable expense, obligated or dispersed over a period of approximately nine months, by a single plaintiff entity against two related defendants who until the damages phase were represented by the same counsel, attests to the extremities to which this litigation had to be pursued and to the intensity of the attendant burdens.[32]

It is of course the prerogative of all litigants to invest as much time and energy in prosecuting or defending a lawsuit as the resources available to them would allow. It is also the professional and ethical duty of all attorneys to be forceful, even zealous, advocates in representing their clients' interests to the utmost demands of the case and their authority to spend on litigation. That is not to say, however, that every component of every lawsuit, every tactical course client and counsel may choose to pursue, is always compelled by the substantive needs of the case, or that litigants from time to time do not resort to strategies deliberately calculated to delay, vex and financially drain an opponent.

Here, putting aside the natural complexities of the action, and acknowledging the strength of advocacy that generally pre-

---

**32.** The Court's Docket Sheet for this case contains over 250 entries, and the Court has prepared at least 12 written decisions, not counting the numerous other shorter orders issued by this Court and the Magistrate Judge who supervised discovery, and the literally hundreds of letters and other documents the parties regularly transmitted to the Court.

vailed on both sides, there were elements of the litigation that the Court believes needlessly complicated and prolonged the ultimate resolution of the merits. On more than one occasion, the Court so admonished the parties.[33] Specifically, as it pertains to Defendants in connection with the assessment of punitive damages, the Court finds that, as it had so warned, some aspects of Defendants' litigation efforts exceeded the bounds of what was reasonably called for even by the highest grade of zealous advocacy. Defendants, for example, chose to take an appeal to the Second Circuit of the Court's grant to TVT of limited preliminary injunctive relief, claiming that the restraining order was uncertain in some respects, even after the Court, on its own motion, issued an amended order specifically intended to clarify the issues about which Defendants had expressed concerns. That appeal was rejected by summary order.

Similarly, Defendants, rather than proceeding to trial at the conclusion of additional discovery the Court allowed to accommodate their requests, proceeded to file an omnibus motion for summary judgment, against the Court's advice that some of the issues raised could be more efficiently addressed in the context of a Rule 50 motion at trial, and that the Court found little merit in some of the principal legal theories Defendants sought to litigate through such a motion. The Court denied the motion on all but one ground. On the eve of the liability phase of the trial, Defendants purported to cancel their earlier repudiation of their contract with TVT, the very agreement that, coming into the trial, they had vehemently denied ever existed, thereby causing a bifurcation of the trial and prolonging final resolution of the merits of the case.

At and following both the liability and the damages phases of the trial, Defendants proceeded to file comprehensive Rule 50(a) motions, to some extent repeating grounds and theories that the Court already had thoroughly dealt with and denied in its numerous earlier rulings on Defendants' motions. The current spate of post-trial motions now before the Court again includes reiteration of issues and arguments that the Court has consistently rejected.

Overall, the Court finds this record sufficient to support a reasonable jury finding that, by reason of Defendants' litigation strategies, TVT's prosecution of this case required outlays of costs beyond the ordinary, and that this consideration, expressed on the evidentiary record only in the form of TVT's legal fees, was germane to the jury's determination of the amount of punitive damages to award TVT.

### (iii) Penalties in Comparable Cases

The application of the third *Gore* guidepost, "civil penalties authorized or imposed in comparable cases," 517 U.S. at 575, 116 S.Ct. 1589, is complicated here because *State Farm*'s elaboration of the punitive damages doctrine has so significantly altered the landscape, providing added focus and dimensions and injecting greater rigor into the assessment of the remedy. These considerations render much of earlier precedents inapposite.

---

**33.** *See, e.g., TVT Records v. Island Def Jam Music Group,* 214 F.R.D. 143, 144 (S.D.N.Y. 2003) (noting "the exhaustive burden that the parties' scorching litigation tactics" had wreaked upon each other and upon the Court); *TVT Records v. Island Def Jam Music Group,* 250 F.Supp.2d 341, 344 (S.D.N.Y. 2003) (admonishing parties for improperly employing certain in limine motions as "preemptive weapons" and denying relief in part for such impermissible use).

TVT points to numerous statutes and cases as providing civil penalties comparable to the range of punitive damages awarded here. *See, e.g., Bogle v. McClure,* 332 F.3d 1347 (11th Cir.2003); *Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.,* No. Civ. A. 00–5481, 2003 WL 21321370 (E.D.Pa. May 30, 2003); *Eden Electrical, Ltd. v. Amana Co., L.P.,* 258 F.Supp.2d 958 (N.D.Iowa 2003). The Court is not persuaded that these examples are sufficiently analogous or germane to the matters at issue here.[34] By and large, the statutes and some of the related cases on which TVT relies concern proscriptions involving unlawful agreements and practices in restraint of trade, securities or health care frauds, false advertising and other forms of unfair competition. In cases under these laws, the situations traditionally have warranted large punitive awards, as detailed in the discussion above, because they normally entail patterns of widespread and sustained large-scale wrongdoing that inflict injuries on multiple actual and potential victims, on investors in public markets and even on the government. The degree of reprehensibility of such misconduct is hardly controvertible, as the multiple civil penalties recoverable are legislatively prescribed and in some instances the malfeasance finds corresponding offenses in the criminal law.[35]

### d. *Conclusion*

As detailed earlier, here the predicate events involve a single contract and infringement dispute between two competitors essentially relating to the release of one recording. And the underlying conduct, though involving fraudulent concealment that the jury found and the Court agrees crossed the threshold of severity warranting a punitive remedy, by no means rose to the magnitude of the far-reaching mischief evident in the precedents TVT cites.

Accordingly, the Court concludes that the punitive damages awards assessed by

---

**34.** *Bogle* entailed a claim pursuant to 42 U.S.C. § 1983 alleging systematic intentional racial discrimination by a public employer. The Court affirmed punitive damages awards in ratios of approximately 4 to 1 where the compensatory damages were awarded for mental and emotional injuries. *See* 332 F.3d at 1359–1362. In *Willow Inn,* the plaintiff, described as a modest family-run business which also served as the residence of some family members, was awarded $2,000 in compensatory damages and $150,000 in punitive damages against the defendant insurance company for a delay of more than two years in paying plaintiff's insurance claim for damage caused to plaintiff's property during a windstorm. The Court found that plaintiff had repeatedly pursued payment of the claim and that defendant did not dispute coverage. In fixing the punitive award, the court adopted an amount approximately equal to the value of plaintiff's claim under the policy and the payment plaintiff ultimately received. *See* 2003 WL 21321370 at *1–*3. In *Eden Electrical,* plaintiff was awarded $2.1 million in compensatory damages and $17.875 million in punitive damages on claims of fraudulent misrepresentation. The court noted that defendant's scheme was devised in return for a sham distributorship that would be terminated once defendant was paid $2.4 million by plaintiff in respect of obligations owed by the prior distributor. *See* 258 F.Supp.2d at 966. The court, though finding that the harm involved was purely economic, noted that "it can hardly think of a more reprehensible case of business fraud." *Id.* at 974. Nonetheless, applying *State Farm,* it reduced the punitive award to $10 million, in part taking into account defendant's net worth. The court also observed that plaintiff, though apparently not a business of the scale of defendant, was a successful, sophisticated businessman who could not be considered a financially vulnerable party. *See id.* at 970.

**35.** *See, e.g.,* the Sherman Antitrust Act, 15 U.S.C. § 15(a); the Lanham Act, 15 U.S.C. § 1117(a); the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq.; *see also* N.Y. Gen. Bus. Law § 340(5) (McKinney 2003).

the jury in this case are excessive under the standards articulated by the Supreme Court in *State Farm* and *Gore.*

## IV. *REMITTITUR*

Remittitur as requested by Defendants is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328 (2d Cir.1990) (citations omitted; internal quotations omitted); *see Shu–Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984). If the Court determines that the verdict is excessive, it should remit the jury's award to the maximum amount that would not be excessive. *See Earl,* 917 F.2d at 1330; *Colbert v. Furumoto Realty, Inc.,* 144 F.Supp.2d 251, 257 (S.D.N.Y.2001).

The Court's next task is to determine the amounts by which the jury's award should be remitted. Relevant to that assessment is another threshold issue raised by Cohen that must be addressed.

## A. *COHEN'S NET WORTH AND ABILITY TO PAY*

Cohen presents an argument that the punitive damages award against him should be remitted on the basis of his financial circumstances and ability to pay. At the outset, the Court notes certain posttrial developments relevant to this issue.

In a letter to the Court from TVT counsel Peter Haviland, dated July 1, 2003, TVT asserted that it had recently become aware that IDJ or an affiliate company would or might indemnify Cohen for the liabilities incurred as a consequence of the present litigation. Accordingly, TVT argued that Cohen cannot be heard to argue for remittitur on the basis of the size of the jury's verdict against him in relation to his net worth. To clarify this matter, TVT sought additional discovery limited to address both whether such an indemnification commitment or understanding exists and whether Cohen's net worth statement precisely and accurately reflects Cohen's true net worth. A flurry of letters soon followed from all three parties in this litigation, in the course of which IDJ and Cohen voiced their opposition to TVT's request for additional discovery.

In particular, the Court notes that in a letter to the Court from Matthew Dontzin, Cohen's counsel, dated July 7, 2003, Cohen questioned the source of TVT's information as regards indemnification by IDJ and opposed the re-opening of discovery posttrial. Cohen's counsel also represented to this Court that, as to this material concern raised by TVT, "Mr. Haviland's assertion is false. In fact, although Mr. Cohen believes that he is fully indemnified, UMG has recently informed Mr. Cohen's counsel that UMG has reserved its rights with respect to indemnification." (Letter from Matthew Dontzin dated July 7, 2003 at 2.) No further elaboration was supplied.

The Court found this statement, appearing in an unsolicited correspondence to the Court, somewhat nebulous. What seemed clear was that Cohen did not categorically and in an unqualified way refute or disclaim, to the best of his knowledge, TVT's assertion regarding indemnification. Cohen asserted that he "believes" he will be "fully indemnified," but the source of or basis for this belief was not identified. From this correspondence, the Court was unable to assess whether Cohen's belief derived from his employment contract, some other binding written or oral commitment, or some potentially gratuitous representation by IDJ or its affiliates, or, indeed, whether the belief was simply wishful thinking on Cohen's part.

More problematic was the representation that IDJ has "reserved its rights with

respect to indemnification." This representation seemed ambiguous and curious as it was not clear whether it meant that IDJ had reserved its rights regarding whether it will indemnify Cohen, or whether IDJ itself will assert some right of indemnification with regard to its own liability. Concerning the latter interpretation, there was no indication or allegation that IDJ will be indemnified by Cohen but, rather, the very opposite. Therefore, if anyone had rights to be reserved, it would seem to have been Cohen as against IDJ (or, again, any relevant affiliates), rather than IDJ as against Cohen. Further complicating the matter was IDJ's position, conveyed to the Court in another unsolicited letter from IDJ's counsel, Michael Mervis, dated July 8, 2003, that "neither UMG nor Vivendi Universal has even decided whether Mr. Cohen is entitled to indemnification . . . ." (Letter from Michael Mervis dated July 8, 2003 at 2.) This representation appeared directly at odds with Cohen's belief that he will be fully indemnified. The matter as it stood before the Court—reflected by the unsolicited correspondence and attendant representations—was thus unclear, and did not create a sufficient record upon which the Court could fully evaluate Cohen's request for remittitur.

The Court concluded that the existence of an indemnification agreement or effectively comparable understanding would undercut and preclude Cohen's arguments that the jury's punitive damages verdict against him is excessive on the basis of his net worth and ability to pay. This conclusion follows from the Second Circuit's decision in *Mathie v. Fries,* in which the Circuit Court

> rule[d] that a fact-finder can properly consider the existence of [an indemnification] agreement as obviating the need to determine whether a defendant's limited financial resources justifies some

reduction in the amount that would otherwise be awarded. It would be *entirely inappropriate for a defendant to raise the issue* of his limited financial resources if there existed an indemnity agreement placing the burden of paying the award on someone else's shoulders.

*Mathie v. Fries,* 121 F.3d 808, 816 (2d Cir.1997) (emphasis added); *see Kemezy v. Peters,* 79 F.3d 33, 37 (7th Cir.1996) (cited affirmatively by *Mathie* ) ("The defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab."); *see also De-Loach v. Bevers,* 922 F.2d 618, 624 (10th Cir.1990) ("If . . . insurance does not cover the punitive damages award, that information should have been presented to the district court in support of the remittitur motion.").

In order to entertain an argument based on financial resources and ability to pay, the Court first must determine whether an indemnification agreement or commitment or representation exists to Cohen's benefit. With respect to the parties' respective burdens of proof, however, the *Kemezy* Court explained that it

> noted the inappropriateness of allowing the defendant to plead poverty if he will be indemnified ... to underscore the *anomaly of requiring plaintiffs* seeking punitive damages always to put in evidence of the defendant's net worth. When the defendant is to be fully indemnified, [net worth] evidence, far from being required, is inadmissible. Thus, in some cases it is inadmissible, but *in no cases is it required.*

79 F.3d at 37 (emphasis added); *see Vasbinder,* 976 F.2d at 122 ("Indeed, the defendants' personal wealth was not put before the jury precisely because the City of New Haven accepted contractual responsibility to indemnify the defendants as to

both compensatory and punitive damages.") (referencing *Hughes v. Patrolmen's Benevolent Ass'n.,* 850 F.2d 876 (2d Cir.), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988), and *O'Neill v. Krzeminski,* 839 F.2d 9 (2d Cir.1988)). In fact, in the context of a remittitur motion, it is the defendant's burden to establish the basis for any reduction in the jury's award, not the plaintiff's. *See Provost v. City of Newburgh,* 262 F.3d 146, 163 (2d Cir.2001) (explaining that "it is the defendant's burden to show that his financial circumstances warrant a limitation of the award.") (citations omitted, internal quotations omitted); *accord Mathie,* 121 F.3d at 816 (same); *Lightning Bolt Prods.,* 861 F.2d at 373 ("The incompleteness of the record as to [a defendant's] net worth is not a basis for reducing the punitive damages award against him, for it is the defendant's burden to show that his financial circumstances warrant a limitation of the award."); *King v. Macri,* 800 F.Supp. 1157, 1163 (S.D.N.Y.1992) (same).

During the discovery phase of this litigation, Cohen, as well as IDJ, vigorously opposed having to disclose details regarding Cohen's net worth, including much of his employment and salary arrangements and terms, and Magistrate Judge Freeman and this Court were ultimately persuaded to grant Cohen's request to essentially limit his disclosures in this regard to a statement of net worth. *See TVT Records,* 257 F.Supp.2d at 748. Cohen opposed TVT's post-trial application for additional discovery, despite his burden as the movant of the present motion, and despite the unsolicited and contradictory representations by the Defendants discussed above, presumably out of concern over the additional imposition such discovery would represent for the Defendants and in an effort to avoid having to disclose arguably private or personal information. The consequence of this strategy decision, in light of the apparently contradictory representations by the Defendants in their letters to the Court, would be to preclude the Court's ability to fairly and fully consider the argument in favor of reducing the jury's punitive damages award against Cohen on the basis of his financial status and ability to pay. The indication that some form of indemnification agreement may have existed to Cohen's benefit compels further inquiry.

Because the matter of indemnification is relevant to the Defendants' post-trial motions, and in light of the Defendants' incomplete and arguably inconsistent positions discussed above, the Court, in an Order dated July 24, 2003, directed Cohen and an appropriate representative of IDJ or its relevant affiliate entity to submit affidavits to the Court addressing specified and delineated concerns on the matter of indemnification. In essence, each Defendant was directed to indicate, with specificity, whether in fact the parties expected that Cohen would be indemnified by IDJ or any of its affiliates, and to explain the sources and basis for their conclusions. In response, the Court received a Declaration of Lyor Cohen, dated July 29, 2003 (the "Cohen Declaration") and a Declaration of Michael Ostroff dated July 29, 2003 (the "Ostroff Declaration")

The Ostroff Declaration reads in relevant part as follows:

Lyor Cohen entered into an employment agreement with Universal Music Group, Inc. dated July 29, 1999. Paragraph 10 of that agreement provides that "Universal agrees that you [Mr. Cohen] will be entitled to indemnification . . . to the extent provided in the Restated Certificate of Incorporation of Universal Studios, Inc. . . . ." That Restated Certificate provides for indemnification "to the fullest extent permitted by the Delaware General Corporation Law." Delaware

law provides that a corporation has the power to indemnify someone in Mr. Cohen's position if he "acted in good faith and in a manner [he] reasonably believed to be in or not opposed to the best interests of the corporation." (Section 145(a) of the Delaware General Corporation Law.) Delaware law further states that "[t]he termination of any action ... by judgment, order, settlement, [or] conviction ... shall not, of itself, create a presumption that the person" has not met the "good faith" or "best interests" standards. (Section 145(a).) ...

Based on its review of the facts and circumstances of this matter, *UMG management believes that Mr. Cohen should not and would not be personally liable in this matter.* Various members of UMG management have previously expressed this position to Mr. Cohen. Vivendi will ultimately decide the company's position as to whether Mr. Cohen will be indemnified, and that decision has not yet been made. UMG management plans to recommend that Mr. Cohen be indemnified. Vivendi has not indicated whether it will follow the recommendation of UMG management. It is likely, however, that the final decision will not be made until the legal proceedings have fully run their course .... At this time we do not know what the final decision will be and therefore we do not know whether Mr. Cohen will be indemnified ....

UMG or Vivendi will continue to advance expenses related to this matter to Mr. Cohen. If an appeal is necessary, these advanced expenses will include the posting of a bond on Mr. Cohen's behalf.

(Ostroff Declaration at 2–3 (emphasis added).) The Cohen Declaration provides in relevant part:

I understand that under my employment agreement with Universal Music Group, Inc. I am entitled to be indemnified to the fullest extent permitted under Delaware law if I acted in good faith and in a manner I believed to be in the best interests of The Island Def Jam Music Group("IDJ"). I am confident that I acted in good faith and in IDJ's best interests with respect to this matter, and I have received oral and written assurances from the company to the same effect. *I therefore believe that I will be indemnified.*

(Cohen Declaration at 1 (emphasis added).)

Cohen relies on *Vasbinder* to argue that the prospect of indemnification is not sufficiently certain here, in contrast to the facts of *Mathie*, so as to defeat his argument for remittitur on the basis of his financial circumstances and ability to pay. The Court rejects this claim.

In *Vasbinder,* there was no indication that the defendants were beneficiaries of any contractual obligation to indemnify them. In fact, the Second Circuit distinguished the facts of that case as against two of its prior decisions—*Hughes* and *O'Neill*—in such a way as to suggest that no such commitment existed in *Vasbinder.* The Second Circuit explained:

No consideration of the defendants' net worth or ability to pay was undertaken in *Hughes.* The personal wealth of the defendants was similarly not an issue in *O'Neill...* [and] the court did not consider whether the amount of damages constituted a disproportionately large percentage of the defendants' net worth. Indeed, the defendants' personal wealth was not put before the jury precisely because the City of New Haven accepted contractual responsibility to indemnify the defendants as to both compensatory and punitive damages.

*Vasbinder,* 976 F.2d at 122 (citation omitted). By contrast, in *Vasbinder,* net worth evidence was considered. *Id.* at 121. Ad-

ditionally, the Court indicated not that any such *contractual* commitment existed but, rather, that "the State of New York has taken the position *in its brief and oral argument* on appeal that it may indemnify the defendants *but is not required to do so*, and has *not made a commitment* to provide indemnification." *Id.* at 122 n. 1 (emphasis added).

In the face of this degree of uncertainty, the Second Circuit in *Vasbinder* chose to consider the defendants' argument for remittitur based on their financial resources and ability to pay. In arriving at this result, however, and in distinguishing the facts of *Vasbinder* from *Hughes* and *O'Neill,* the Second Circuit seemed attentive not to some sort of absolute clairvoyant certainty but, rather, to a *"contractual* responsibility to indemnify . . . ." *Id.* at 122 (emphasis added). Similarly, in *Mathie,* the Second Circuit explicitly considered "the *existence of such an [indemnification] agreement"* to be determinative. 121 F.3d at 816 (emphasis added).

While in neither instance did the Circuit Court directly address the degree of certainty required, the language of these decisions reflects the quite practical understanding that clairvoyant foresight as to what actually will happen is not only impossible to establish epistemologically, but it also would allow a defendant who otherwise would benefit from a clear indemnification agreement or commitment to simply assert that the indemnifying entity might not honor that obligation. This, in turn, would undermine the very principle outlined by the Second Circuit and other federal Courts of Appeals that "[i]t would be entirely inappropriate for a defendant to raise the issue of his limited financial re-

sources if there existed an indemnity agreement placing the burden of paying the award on someone else's shoulders." *Mathie,* 121 F.3d at 816 (emphasis added); *see Kemezy,* 79 F.3d at 37 ("The defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab.").

In *Mathie,* the Second Circuit affirmed the district court's decision not to alter the jury's award, on the basis of the defendant's ability to pay, because of a statutory obligation on the part of Suffolk County to indemnify peace officers like the defendant against judgments for damages, including punitive damages, arising out of tortious activity that occurred within the scope of the officer's employment. *See Mathie v. Fries,* 935 F.Supp. 1284, 1302 (E.D.N.Y. 1996) (quoting N.Y. Gen. Mun. L. § 50–m).[36] Similarly, in this case, the Ostroff Declaration and Cohen Declaration indicate that both IDJ and Cohen, as well as the Universal Music Group, Inc., the parent company of IDJ and Cohen's official employer, recognize the existence of a valid contractual obligation whereby UMG contractually committed to indemnify Cohen fully to the extent that he acted in the best interests of his employer. All three are of the view that Cohen has acted in the best interests of his employer, and UMG is of the view that Cohen "would not" be personally responsible for the damages award against him. Bolstering this conclusion is the fact that UMG has communicated as much to Cohen orally and in writing, and that UMG has and will continue to pay the costs of the litigation in this matter, including any necessary appeal bond. UMG also indicates that it intends to recommend that Vivendi Universal, UMG's

---

**36.** Despite so holding, however, the Second Circuit in *Mathie* went on to reduce the size of the punitive damages award at issue in that case based on reasons independent of the defendant's limited financial resources, applying instead applicable guidance propounded by the United States Supreme Court. *See Mathie,* 121 F.3d at 816–17.

parent company with whom the final decision apparently rests, fully indemnify Cohen accordingly.

■ Under these circumstances, the Court finds that the record is sufficiently clear that Cohen probably will be indemnified by his employer for the costs incurred as a result of this litigation, including the final damages awards. The mere fact that Vivendi Universal has chosen not to formally indicate its position on the matter until after this litigation, including any appeal, has run its course cannot, for the reasons previously indicated, insulate Cohen from the present consequences of what is otherwise a clear and expected benefit of the terms of his employment contract, namely, a contractual commitment to indemnify him. For these reasons, Cohen's financial circumstances and ability to pay does not constitute grounds to remit the award of punitive damages assessed against him. *See, e.g., Mathie,* 121 F.3d at 816 ("Because the District Judge neither enhanced nor based the amount of punitive damages actually assessed upon the existence of the indemnity agreement, but merely determined the amount of the award without considering [the defendant's] financial condition, no error occurred.") Nonetheless, the Court, for the reasons discussed above and elaborated below, finds independent grounds for remittitur.

### B. *REMITTITUR AS TO COHEN*

The compensatory damages verdicts the jury returned against Cohen in amounts of the $22,358,713 and $1,011,313 with regard to TVT's claims of injuries caused by tortious interference with contractual relations and fraud, respectively, are substantial and represent complete satisfaction. Taking into account all of the considerations detailed above, the Court concludes that a punitive sanction in the amounts set forth below would be maximally sufficient to serve the retributive and deterrent purposes of civil penalties without violating due process principles. Accordingly, the punitive awards assessed against Cohen for the two claims as to which liability was found should be remitted to $2,000,000 and $1,000,000, respectively.

### C. *REMITTITUR AS TO IDJ*

On the same basis, the Court concludes that in respect of the compensatory damages verdicts the jury returned against IDJ in amounts of $126,720, $22,358,713 and $1,011,313 with regard to TVT's claims of injuries caused by breach of contract, tortious interference with contractual relations, and fraud, respectively, the corresponding punitive awards should be remitted to $125,000, $25,000,000 and $1,000,000.

### V. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motions of defendants The Island Def Jam Music Group ("IDJ") and Lyor Cohen ("Cohen") for a new trial in respect of this action are granted unless plaintiffs TVT Records and TVT Music, Inc. (collectively "TVT") elect to remit the punitive damages awards the jury returned after trial of this case, as recorded in the Judgment dated June 20, 2003, to amounts as follows: to $125,000 as to the claim of breach of contract against IDJ; to $25,000,000 and $1,000,000, respectively, as to the claims of tortious interference with contractual relations and fraud by fraudulent concealment against IDJ; and to $2,000,000 and $1,000,000, respectively, as to the claims of tortious interference with contractual relations and fraud by fraudulent concealment against Cohen; and it is further

**ORDERED** that TVT's election shall be filed with the Court and served on Defendants within twenty (20) days of the date of this Order, and it is finally

**ORDERED** that execution of the judgment rendered herein be stayed for a period of ten (10) days in accordance with the provisions of Federal Rules of Civil Procedure 62(a) and 6, insofar as the latter may be applicable.

**SO ORDERED.**